CRH:JEA
F.# 2019R01179

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -                           20-CR-135 (CBA)

AWAIS CHUDHARY,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS

JACQUELYN M. KASULIS
Acting United States Attorney
Eastern District of New York

Jonathan E. Algor
Assistant United States Attorney
(Of Counsel)

## PRELIMINARY STATEMENT

Defendant Awais Chudhary ordered and attempted to obtain a tactical knife and tactical gear with the goal of conducting a terrorist attack in support the Islamic State of Iraq and al-Sham ("ISIS"). After watching violent terrorist propaganda videos, the defendant sought guidance from what he believed to be ISIS supporters in his quest to conduct a knife and/or bomb attack in Queens, New York, so that he could further ISIS's terrorist aims. The defendant was stopped by law enforcement as he attempted to retrieve the tactical knife and other gear at an Amazon locker in Queens, New York. Following his arrest, the defendant was charged in an Indictment with attempting to provide material support to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B. The defendant has now moved to dismiss the Indictment. See Def.'s Mot. to Dismiss ("MTD"), Docket Entry No. 56.

The defendant's motion should be denied. The defendant's motion to dismiss makes claims that are without legal support, are contrary to binding precedent, and have been repeatedly denied by courts in this Circuit and elsewhere.

## BACKGROUND

The factual background below is based on information contained in the affidavit in support of a complaint against the defendant, as well as materials produced to the defendant in discovery.

I.  The Islamic State Of Iraq And Al-Sham (ISIS)

On or about October 15, 2004, the U.S. Secretary of State designated al Qaeda in Iraq ("AQI") then known as Jam 'at al Tawhid wa' al—Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (the "INA")

and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224. On May 15, 2014, the Secretary of State amended the designation of AQI as a Specially Designated Global Terrorist entity under Section 1(b) to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham (abbreviated as ISIS, which is how the FTO is referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al-Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

On or about September 21, 2014, ISIS spokesperson Abu Muhammad al-Adnani issued a recorded statement calling for attacks against citizens – civilians or military – of the countries participating in the United States-led coalition against ISIS.

ISIS members and associates make and have made public statements and issued public declarations, which, among other things, (i) proclaimed and acknowledged that ISIS had committed acts of violence; (ii) threatened future acts of violence if ISIS's demands were not met; and (iii) were intended to promote and foster the prestige and standing of ISIS. Since 2013, ISIS supporters have claimed credit for numerous terrorist activities, including multiple attacks against American in the United States and against Westerners abroad, and have publicly expressed a desire to continue to target and attack the United States and the West. ISIS supporters have claimed responsibility for several attacks in the United States, including: the May 2015 shooting in Garland, Texas, at an exhibition featuring cartoons of the Prophet Mohammed; the December 2015 shooting in San Bernardino, California, at the Inland Regional Center; and the June 2016 shooting in Orlando, Florida, at the Pulse nightclub.

ISIS and its supporters have also claimed responsibility for many violent attacks in Europe and South Asia, including: the November 2015 shootings and suicide bombings in Paris, France, at the Bataclan concert hall, a sports stadium, and several restaurants; the July 2016 truck attack in Nice, France during Bastille Day celebrations; the December 2016 truck attack in Berlin, Germany at a Christmas market; the May 2017 suicide bombing in Manchester, United Kingdom at a concert; the August 2017 van attack in Barcelona, Spain; an August 2018 suicide bombing in Kabul, Afghanistan; and the Easter Sunday 2019 series of suicide bombings in Sri Lanka.

To gain supporters, ISIS, like many other terrorist organizations, spreads its messages using social media, Internet platforms, and email. Using these platforms, ISIS posts and circulates videos and updates of events in Syria, Iraq, and other ISIS-occupied areas, in English, Arabic, and other languages, to draw support to its cause. ISIS has disseminated a wide variety of recruiting materials and propaganda through social media, which includes photographs and videos depicting ISIS activities, including beheadings and other atrocities, as well as audio and video lectures by members of ISIS and members of other Islamic extremist organizations.

II.    The Defendant's Attempt to Commit a Terrorist Attack for ISIS

Beginning in August 2019, the defendant began communicating with law enforcement officers acting in an undercover capacity (the "UCs") based on the defendant's desire and plans to conduct a knife and/or bomb attack in Queens, New York on behalf of ISIS.

On or about August 23, 2019, the defendant started to converse with a UC ("UC-1"). During this time, the defendant also began communicating with a second UC ("UC-2") through text messaging. Throughout his communications with UC-1 and UC-2, the defendant

repeatedly expressed his support for ISIS and stated that he wanted to conduct a knife or bomb attack in Queens, New York, in locations such as the pedestrian bridges over the Grand Central Parkway to the Flushing Bay Promenade (the "Promenade") and the New York World's Fair marina located in the Promenade, and to record his attack in order to inspire others to perform similar attacks.

On or about August 23, 2019, the defendant requested a video and information from UC-1 regarding the "proper knife" for committing a stabbing attack. The defendant also asked UC-1 for information regarding "how not to leave traces of finger prints, DNA, etc."[1] When UC-1 asked the defendant to send photographs of the locations that he was considering for an attack, the defendant explained that he did not have a "proper knife" for the attack and needed to know the name of the type of knife required to successfully complete an attack. The defendant noted that he had viewed an image of "the ideal knife" which had a hand guard but he did not know its name. The defendant also sent one of the UCs a screenshot of a document with the words "Islamic Stat[e]" at the top and the subheadings "Places to Strike," "The Ideal Knife," and "Knives to Avoid." The instruction further included a diagram of the human body depicting where to stab victims with a knife.

The defendant explained that he needed this information because he was "in the west" and that he was asking Allah to, among other things, "not let us get caught or imprisoned, for indeed the entire plot belongs to Allah alone." The defendant further told UC-1 that he had

---

[1]     Communications quoted herein have not been edited to correct grammatical and/or spelling errors, except where indicated in brackets.

pledged his allegiance to ISIS's leader Abu Bakr al Baghdadi[2]—specifically that he had given "ba'yah to Ameer al-Mu'mineen"[3]—and that he wanted to commit an attack as a "lone wolf."

During that same conversation on August 23, 2019, the defendant noted that he intended to commit a knife attack because "that's what [he] know[s]," but that he would consider conducting a bombing attack if UC-1 instructed him "on how to build a bucket bomb." The defendant stated that he wanted to know the best way to make a bomb so that it was "swift with no traces left behind." He also discussed the use of a bucket bomb to "target multiple vehicles" and possible targets for a bombing attack, which included a "mini bridge over a busy rode with many cars" or a "quiet and darker area that's near a wide river where people pass."

The defendant thereafter explained that he had taken videos of various locations an hour earlier and was sending them to UC-1. He told UC-1 that the videos depicted the bridge he mentioned earlier and that he "was thinking about simply throwing bucket bombs or several light weight bombs as the car over the fencing" but he did not know how to construct them. The defendant also told UC-1 that he would send a different video depicting the "knife area" where he intended to conduct an attack, but the video files were too large because he had

---

[2]     Abu Bakr al Baghdadi, also known as "Ameer al-Mu'mineen" was the leader of ISIS from 2014 until his death in 2019. In 2011, the U.S. Department of State designated al-Baghdadi as a Specially Designated Global Terrorist under Executive Order 13224. Under al-Baghdadi, ISIS was responsible for thousands of deaths of civilians in the Middle East, including the brutal murders of numerous civilian hostages from Japan, the United Kingdom and the United States.

[3]     Bay'ah is an Islamic practice of declaring one's allegiance or an oath to a particular leader.

recorded them with his cellphone. UC-1 thereafter instructed the defendant to send the videos to another account which was controlled by UC-2.

The defendant then sent multiple videos of his proposed attack locations to UC-2, including video files that depicted a bridge and other videos titled "First Portion after bridge" and "Third Portion after bridge." The videos show the pedestrian bridges over the Grand Central Parkway to the Promenade in Queens. The defendant also sent UC-2 two videos depicting bomb attacks. After sending the first video, the defendant explained that the bomber depicted in the video was "what I mean by bucket bomb or something hefty as you see he placed it and then moved away for its hefty explosion for the grace of Allah." He then sent the second video and noted "this is what I mean by a light weight easy to carry explosive" and asked UC-2 to watch the videos so that UC-2 could provide guidance on whether the bombs would be suitable for the defendant's proposed attack locations. A review of the videos sent by the defendant shows that at least one of the videos appeared to be produced by ISIS, featuring a graphic of an ISIS flag in the upper left-hand corner.

The next day, the defendant continued his communications with UC-1. The defendant told UC-1 that he selected his proposed attack locations because they have "easier escape routes" and "more room for [his] scooter." The defendant thereafter explained his timeline for procuring supplies to conduct an attack and noted that he wanted to start with a knife because buying materials for explosives "bring suspicion by the crusaders and their miserable worshippers." He also stated that he had searched Amazon's website for the knife he wanted to use in his attack but could not find the "proper knife" and asked UC-1 for suggestions and whether he needed gloves and a mask. After UC-1 sent him a photograph of a knife, the defendant responded that "buying a knife like this draws attention." The defendant

also sought guidance on the use of "medical latex gloves" during an attack and whether they would "not leave fingerprints and DNA." He also asked for training videos to show "how to effectively use [a] knife and training in general . . . as training for Jihad for Allah is worship in itself." Finally, the defendant noted during his conversations with the UCs that he considered committing the attack "near one of the Masjids and then enter the Masjid for changing clothes," where there was "a lot of darkness" and he could "wait therein if their police forces or army – woe to them – come, as they do after an attack by the Khilafah," and to leave his backpack and scooter to retrieve them later.[4]

As noted above, the defendant sent the UCs various videos depicting reconnaissance that the defendant had previously conducted of proposed attack locations. On or about August 24, 2019, law enforcement officers conducted surveillance of the defendant and observed him exit his residence in Queens and proceed on foot to the area in and around the Promenade. The surveilling agents observed the defendant enter the Promenade and take videos and photographs of the area with a cellphone, sometimes in a surreptitious manner by holding the cellphone close to his chest.

The surveilling agents also observed the defendant taking videos and/or photographs of, among other things, parts of the Promenade, the World's Fair marina, a security gate leading to the marina, a gas station and donut shop located in or around the Promenade, and a security camera located in the vicinity of the donut shop.

---

[4]  As relevant here, "Masjid" and "Khilafah" are Arabic words for a mosque and caliphate respectively. One of ISIS' primary goals is to form an Islamic state or "caliphate" in conquered territory.

The defendant's communications with the UCs continued in subsequent days during which he took further steps in his plan to conduct an attack on behalf of ISIS. On or about August 25, 2019, the defendant and UC-1 discussed purchasing through the Amazon website different items for the attack, including, among others, several knives, a strap for the defendant's cellphone, gloves, a mask, and tactical clothing. UC-1 thereafter provided the defendant with an Amazon account, preloaded the account with money and placed the following items in the shopping cart: (a) an 11-inch black "Fixed Blade Tactical Knife"; (b) a nine-inch high carbon "Fixed Blade Knife"; (c) a two-piece "Tactical Combat Survival Hunting & Neck Knives"; (d) a cellphone chest and head strap; (e) a polo shirt; (f) tactical lightweight assault cargo pants; (g) a black face mask; and (h) a pair of "covert Tactical" gloves. In response, the defendant sent UC-1 two screenshots of two knives and informed UC-1 that he was "having difficulty choosing between them."

Later that day, the defendant sent UC-1 a screenshot indicating that he had ordered a "420 High Carbon Stainless Steel Fixed Blade survival Tactical Knife," but the defendant eventually canceled that order because he wanted to have it delivered more quickly. The defendant subsequently informed UC-1 that he had found "one with a serrated edge," and sent UC-1 a screenshot which depicted an order from Amazon including, among other things, khaki-colored pants, a mask, a strap, and gloves. The defendant explained to UC-1 that the items would be delivered on Wednesday, August 28, 2019, and that he would use the Amazon delivery location in the Shops at Skyview Center in Queens. A review of the Amazon order shows that the defendant purchased the following: (a) a 420 High Carbon Stainless Steel Fixed Blade Survival Tactical Knife; (b) a cellphone chest and head strap; (c) tactical lightweight

assault cargo pants; (d) a black face mask; and (e) a pair of "Hard Knuckle Full Finger Tactical Gloves."

V.     The Defendant's Arrest

On August 29, 2019, law enforcement officers conducted surveillance and observed the defendant depart his residence and travel to the Shops at Skyview Center in Queens.  Law enforcement officers further observed the defendant approach an Amazon locker and the officers arrested the defendant as he attempted to open the locker.

VI.    The Defendant's Criminal Case

On August 30, 2019, the defendant was charged by complaint with attempting to provide material support and resources to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B(a)(1).  On March 12, 2020, a grand jury sitting in the Eastern District of New York charged the defendant with one count of attempting to provide material support and resources to a foreign terrorist organization, in violation of the same statute.  The Indictment charges:

> In or about August 2019, within the Eastern District of New York and elsewhere, the defendant AWAIS CHUDHARY did knowingly and intentionally attempt to provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), including services and personnel, including himself, to a foreign terrorist organization, to wit: the Islamic State of Iraq and al-Sham ("ISIS"), which, at all relevant times was designated by the Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act, knowing that ISIS was a designated foreign terrorist organization and that ISIS had engaged in and was engaging in terrorist activity and terrorism.

(Title 18, United States Code, Sections 2339B(a)(l) and 3551 et seq.)

**ARGUMENT**

The defendant makes several arguments in support of his motion to dismiss the indictment. None of these arguments have merit and the motion should be denied.

A.     The Indictment States An Offense

The defendant argues that the Indictment should be dismissed because it is "both over- and under-inclusive" and thus fails to state an offense. (See MTD at 4.) The defendant argues that the Indictment is "under-inclusive" because it fails to specifically allege that, as part of his plan to provide personnel, the defendant "sought to work under an organization's direction and control" and "over-inclusive" in that it "specifies one form of material support . . . while leaving the door open to others[.]" (See MTD at 1, 4.) To the contrary, the Indictment alleges all of the essential elements of a violation of 18 U.S.C. § 2339B.

1.     An Indictment Must Identify The Essential Elements Of The Offense

Every indictment must set forth "all of the essential elements of the crime[.]" United States v. Gonzales, 686 F.3d 122, 127 (2d Cir. 2012). This ensures that defendants are not "convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury" that returned the indictment. Russell v. United States, 369 U.S. 749, 770 (1962). An indictment must also be specific enough to permit the defendant to prepare his defense. See, e.g., U.S. CONST. amend. VI (indictment should be sufficiently clear so that the defendant "will not be misled while preparing his defense"). These requirements, important though they are, do not require that every detail of the charged crime be spelled out: "[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (internal marks and citation omitted).

2.    The Indictment Alleges Each Element Of The Material Support Offense

The material support statute, 18 U.S.C. § 2339B, has three essential elements:

- The defendant knowingly and intentionally provided material support or resources to an FTO (or attempted to do so);

- The defendant knew that the FTO was an FTO, or that the FTO had engaged in terrorist activity or terrorism; and

- The defendant is subject to the jurisdiction of the United States.

See 18 U.S.C. § 2339B. The government must also identify the type of material support provided. See United States v. Awan, 459 F. Supp. 2d 167, 175-76 (E.D.N.Y. 2006) (dismissing indictment without prejudice and with leave to re-charge where court held that allegation of "material support," without specifying form of support, was insufficient notice of charges under 18 U.S.C. § 2339A). The Indictment alleges each of these essential elements including the form of material support provided: "CHUDHARY did knowingly and intentionally attempt to provide material support and resources . . . including services and personnel, including himself" (emphasis added). Not only does the charge make clear that the form of support includes "services" and "personnel," it also explicitly states that personnel in this case is the defendant himself rather than some other person.

The defendant's claim that the term "including" somehow renders the indictment defective because it "leaves the door open" for the government to pursue a different form of material support at trial (MTD at 4-5), is wrong. Several courts have found indictments sufficient that use the same phrasing for a material support charge. See, e.g., United States v. Pugh, No. 15-CR-116 (NGG), 2015 WL 9450598 at *11 (E.D.N.Y. Dec. 21, 2015) (finding that indictment that charged "including personnel, including [the defendant] himself" was

sufficient); <u>United States v. Taleb-Jedi</u>, 566 F. Supp. 2d 157, 165-66 (E.D.N.Y. 2008) (holding that charge including phrase "including personnel" was sufficient). In any event, the government hereby confirms that it does not intend to argue that the defendant provided any form of material support other than services and personnel based on the current charge. <u>See</u> <u>Taleb-Jedi</u>, 566 F. Supp. 2d at 166 (government's confirmation that it would proceed only on personnel theory for charge further supported sufficiency of indictment).

The defendant's additional claim that the government needed to specifically allege in the Indictment that he attempted to work under ISIS's "direction and control" (MTD at 5-9) is also incorrect. Indeed, the defendant concedes that no court has embraced this argument and, in fact, every court to consider this argument has rejected it. <u>See</u> <u>id.</u> Where the material support at issue is "personnel," the government is required to offer sufficient proof— at trial—that the personnel in question meet the definition of personnel set out in 18 U.S.C. § 2339B(h) ("Section 2339B(h)"). That definition requires that the personnel the defendant attempted to provide, <u>i.e.</u> himself, were intended to "work under [the FTO's] direction or control." <u>See</u> Section 2339B(h). Because Section 2339B(h) is merely a "definitional provision," and not an essential element, it need not be pleaded in the indictment. <u>See</u> <u>Pugh</u>, 2015 WL 9450598, at *6 ("Section 2339B(h) further defines "personnel" and is not an affirmative defense or an essential element of the offense of providing material support to an FTO."); <u>see</u> <u>also</u> <u>United States v. Shafi</u>, 252 F. Supp. 3d 787, 793-94 (N.D. Cal. 2017) ("Construing [Section 2339B](h) as an element would be largely redundant because it simply modifies the meaning of the word 'personnel' as used in subsection (a). In this way, [Section

2339B](h) functions in the same way a statutory definition section does."); accord United States v. Ludke, 2017 WL 9772960, at *6 (E.D. Wisc. Dec. 11, 2017.)[5]

The courts to consider this argument in the Eastern District of New York have held that Section 2339B(h) is merely definitional. Most recently, in United States v. Augustine, 18-CR-393 (SJ), 2021 WL 1381060, at *2 (E.D.N.Y. Apr. 13, 2021), Judge Johnson held that Section 2339B(h) is not an essential element that must be pled. In doing so, Judge Johnson noted approvingly of Judge Garaufis's reasoning in Pugh, which also considered and rejected the same argument the defendant advances in this motion. Id. Reviewing the statutory text, Judge Garaufis identified two statutory features indicating that Section 2339B(h) was definitional:

> First, [Section 2339B](h) begins: "No person may be prosecuted under this section in connection with the term 'personnel'[.]" The use of the phrase "the term 'personnel,'" with personnel in quotation marks, indicates that [Section 2339B](h) was intended to piggy-back on the statutory term "personnel" as used in the defined term "material support or resources." [Section 2339B](h) then goes on to limit the scope of that definition. It appears, therefore, that Section 2339B(h) was intended by Congress to be definitional.
>
> Second, the structure of [Section 2339B](h) suggests that it was . . . intended to be definitional. [Section 2339B](h) provides . . . language [that] materially tracks the substantive offense outlined in Section 2339B(a)(1)[.] . . . Of course, "material support or resources" is a defined term that includes the provision of "personnel." The only material difference, then, between Section 2339B(h) and Section 2339B(a), in the context of "personnel," is that Section 2339B(h) pulls back on the breadth of the term

---

[5]     One district court has held otherwise—but that case does not help the defendant. In United States v. Ahmed, the court concluded that Section 2339B(h) functions as an affirmative defense, not as an element that must be charged in an indictment. United States v. Ahmed, No. 15-CR-49 (MJD), 2015 U.S. Dist. LEXIS 171561, at *6-7 (D. Minn. Sept. 1, 2015).

> "personnel." Put another way, [Section 2339B](h) is doing
> nothing more than limiting the breadth of Section 2339B(a)(1)
> with regard to "personnel" offenses.

<u>Pugh</u>, 2014 WL 9450598, at *8. Having concluded that Section 2339B(h) was definitional,

Judge Garaufis then concluded: "That courts do not require an indictment to plead beyond the

term 'personnel' is unsurprising. In fact, it follows the longstanding rule that an indictment

need not plead statutory definitions." <u>Id</u>. at *13. The same result should control here. Because

the Indictment states all the essential elements of the 18 U.S.C. § 2339B offense, and because

Section 2339B(h) is definitional, this aspect of the defendant's motion should be denied.

B.      The Evidence Is Sufficient For A Jury To Find The Defendant Guilty Of
        Attempting To Provide Material Support To ISIS

The defendant also moves to dismiss on the basis that there is insufficient

evidence to convict the defendant of attempted material support of a foreign terrorist

organization. This argument should be denied, because it would be premature for the Court to

reach the factual allegations of the Indictment. If the Court does so, however, the government

respectfully submits that the factual allegations set forth in the Indictment are more than

sufficient to state an offense under Section 2339B for attempting to provide material support.

1.      The Defendant's Motion Should Be Denied As Premature

The defendant argues that the Indictment fails to allege sufficient facts to state

an offense under Section 2339B. (<u>See</u> MTD at 11-18.) However, "[i]t is axiomatic that, in a

criminal case, a defendant may not challenge a facially valid indictment prior to trial for

insufficient evidence. Instead, a defendant must await a Rule 29 proceeding or the jury's

verdict before he may argue evidentiary insufficiency." <u>United States v. Gambino</u>, 809 F.

Supp. 1061, 1079 (S.D.N.Y. 1992); <u>United States v. Brown</u>, 321 F. Supp. 2d 598, 600

(S.D.N.Y. 2004) (same). The government is not required in an Indictment to make a proffer of its trial evidence. See Alfonso, 143 F.3d at 776 ("an indictment need do little more than to track the language of the statute"). The defendant's motion is premature and should await the presentation of the government's evidence at trial, at which time the Court can revisit this question in the form of a Rule 29 motion at the close of the government's case. See Augustine, 2021 WL 1381060, at *3.

Under Federal Rule of Criminal Procedure 12(b)(3), a defense that an indictment fails to state an offense may be raised by a pretrial motion only "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits" (emphasis added). Where the motion cannot be determined without reference to the evidence that would be presented at trial, it must be denied. "Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . . the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." Alfonso, 143 F.3d at 776-77. A technically sufficient indictment like the Indictment in this case "is not subject to dismissal on the basis of factual questions, the resolution of which must await trial." United States v. Laurent, 861 F. Supp. 2d 71, 110 (E.D.N.Y. 2011); see also United States v. Yakou, 428 F.3d 241, 246 (D.C. Cir. 2005) ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"); United States v. Thomas, 150 F.3d 743, 747 (7th Cir. 1998) (Easterbrook, J., concurring) ("Summary judgment does not exist in criminal cases").

The district court's opinion on a motion to dismiss a material support of an FTO charge in United States v. Naseer, 38 F. Supp. 3d 269 (E.D.N.Y. 2014), is instructive. Like the defendant in this case, the defendant in Naseer challenged the sufficiency of the

government's evidence in support of several charges related to terrorism, including a charge of conspiring to provide material support to al-Qaeda. Judge Dearie rejected the defendant's argument as not "cognizable on a motion to dismiss." Id. at 274. The court quoted Alfonso's holding that "the sufficiency of the evidence … is not appropriately addressed on a pretrial motion to dismiss an indictment" and explained that "the test of the evidence is the trial." Id. So too here. The defendant may offer his argument that he did not attempt to provide material support to ISIS as a trial defense, but a jury is entitled to hear the evidence of the defendant's acts and determine for itself whether that evidence proves beyond a reasonable doubt that the defendant violated federal law.

The government has not made a full proffer of the evidence that it intends to prove at trial in support of the Section 2339B charge. Once the government has made such a proffer by presenting its case at trial, the Court can revisit – if appropriate – the defendant's argument in the form of a Rule 29 motion at the close of the government's case. Without the government having the opportunity to present its evidence to the jury, the defendant's motion is premature.

## 2. The Factual Allegations Are Sufficient To State An Offense

Should the Court reach the merits of the defendant's motion now, the government submits that the factual allegations set forth in the Indictment and Complaint in this case are sufficient to state an offense under Section 2339B. "On a motion to dismiss pursuant to Rule 12(b), a court must accept all factual allegations in the indictment as true." United States v. Gotti, 457 F. Supp. 2d 411, 421 (S.D.N.Y. 2006). In reviewing the sufficiency of the allegations, the court must "view all of the evidence in the light most favorable to the Government and determine if there is any evidence 'upon which a reasonable mind might fairly

conclude guilt beyond a reasonable doubt.'" Id. (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)).

The Indictment charges the defendant with knowingly and intentionally attempting to provide material support to ISIS, by offering services and himself as personnel to be used for the FTO's benefit. The defendant argues that there is "no evidence" to prove that the defendant "intended to join, fight for, or otherwise work under the direction and control of ISIS" and "no evidence of a substantial step" towards providing material support to ISIS. (See MTD at 13.) However, as detailed above, the complaint alleges and the evidence at trial will prove, that the defendant (i) researched ISIS's activities and watched jihadist and ISIS propaganda videos, (ii) sought out ISIS supporters for guidance to plan a knife and/or bomb attack in Queens in support of ISIS's cause; (iii) conducted reconnaissance of potential areas where the defendant intended to conduct a terrorist attack; (iv) pledged his allegiance to ISIS and its leadership; and (v) researched, ordered and attempted to obtain tactical equipment which the defendant intended to use in his terrorist attack, including a tactical knife, video equipment to record the attack and tactical gear. Viewing all of these factual allegations in the light most favorable to the government, a rational juror could find beyond a reasonable doubt that the defendant knowingly and intentionally attempted to provide material support to ISIS.

Several cases, including Second Circuit decisions, have held that evidence similar to the allegations presented in this case are sufficient to support an attempted material support charge. For instance, in United States v. Pugh, 937 F.3d 108 (2d Cir. 2019), the Circuit affirmed a conviction of a defendant for attempting to provide material support to ISIS. The defendant in Pugh "research[ed] the Islamic State of Iraq and the Levant ("ISIL" or ISIS"), and download[ed] propaganda materials, as well as discuss[ed] ISIS tactics and activities

online," conducted internet searches relating to ISIS and its presence in certain countries, wrote a letter to his wife pledging his support to ISIS, and traveled to Turkey. Id. at 114. The court explained that "a defendant may be convicted of attempt even where significant steps necessary to carry out the substantive crime are not completed," and that "a substantial step towards the provision of material support need not be planned to culminate in actual terrorist harm, but only in support—even benign support—for an organization committed to such harm." Id. at 119. Like the defendant here, the defendant in Pugh claimed that a lack of a specific ISIS contact precluded any determination that he took a substantial step necessary to attempt to provide material support. The Circuit rejected this argument:

> The evidence, taken together and viewed in the light most favorable to the government, provides ample support for the jury's conclusion that Pugh engaged in a substantial step toward providing material support to ISIS. Although he was apprehended by Turkish officials before he was able to complete his plan, the evidence supports the finding that he was traveling to Turkey to cross the Syrian border in an effort to join ISIS. Although he did not have an ISIS contact, nor had he sworn a formal oath of allegiance to the organization, the steps he had completed were nonetheless substantial and were "planned to culminate" in his support of ISIS….But for the interference of Turkish officials, there is no indication that Pugh would not have completed his journey to Syria to join ISIS. Accordingly, there was sufficient evidence to sustain the jury's conclusion that Pugh took a substantial step toward providing material support to a foreign terrorist organization. His conviction on count one is affirmed.

Pugh, 937 F.3d at 119–20 (citations omitted). Moreover, the claim of "no contact" rings particularly hollow in this case, since the evidence demonstrates that the defendant believed he was in contact with ISIS supporters, but who fortunately were law enforcement.

Other decisions in this Circuit, faced with similar factual issues (typically reviewed after full consideration of the evidence at trial) have likewise held that conduct like

that at issue in the present case are sufficient to support a guilty verdict for attempting to provide material support. See, e.g., United States v. Farhane, 634 F.3d 127, 149 (2d Cir. 2011) (holding that meeting with purported al-Qaeda member, swearing bay'ah[6] to al Qaeda, providing his contact number and promising to be on call as a doctor to treat wounded al Qaeda members were sufficient to support attempted material support conviction); see also id. at 151 (explaining that Section 2339(B) "criminalizes providing personnel through self-recruitment (i.e., volunteering oneself to serve under the direction of a terrorist organization) no less than through recruitment (securing another person to serve under such direction)"); United States v. Kaziu, 559 Fed. App'x 32 (2d Cir. 2014) (holding that "the evidence of [the defendant's] travels overseas with the intended object of joining [an FTO] in its war against the Somali government was sufficient to permit the jury to find the substantial step necessary for attempt").

The Circuit's decisions in Pugh, Farhane, and Kaziu are controlling precedent and directly applicable to the facts of this case. A rational jury could conclude that the defendant's research, his admitted support for ISIS' cause and awareness of ISIS' violent conduct, and his decision to provide reconnaissance videos and then order and attempt to retrieve materials that he intended to use in a terrorist attack on behalf of ISIS are sufficiently substantial steps towards providing material support to an FTO. Accordingly, the defendant's sufficiency challenge should be denied.

---

[6] The term is spelled as "bayat" in the Farhane decision.

C.     The Material Support Statute Does Not Violate The Non-Delegation Doctrine

Lastly, the defendant claims that the FTO designation process constitutes an unconstitutional delegation of authority to the Executive Branch because it allows designation of a foreign terrorist organization without congressional oversight.  (See MTD at 18-33).  However, all courts to examine this issue, including courts in this District, have rejected the defendant's argument.  Indeed, in Taleb-Jedi, Judge Cogan rejected this argument because "an FTO designation is subject to judicial review—the decision may be challenged by the organization itself."  666 F. Supp. 2d at 172.  Further, Congress has established procedures to designate FTOs and retains power to revoke any such designation.  Id.  In Mistretta v. United States, 488 U.S. 361, 372 (1989), the Supreme Court stated:

> So long as Congress "shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power."

Id. (citing J.W. Hampton Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)).   Here, Congress has provided clear standards and detailed procedures to govern the process by which the Executive Branch designates FTOs.  In order to issue an FTO designation, the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, must find that "(A) the organization is a foreign organization; (B) the organization engages in terrorist activity . . . ; and (C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States." 8 U.S.C. §§ 1189(a)(1), 1189(d)(4).   The definition of "terrorist activity" is further spelled out by statute.   Id. Moreover, under the statute, Congress retains a role in the designation process.  The Secretary of State is required to provide advance notification to congressional officials prior to making

a designation.  <u>See</u> 8 U.S.C. § 1189(2)(A)(i).  The statute also explicitly reserves for Congress the authority to prevent a designation from taking effect: "Congress, by an Act of Congress, may block or revoke a designation."  <u>Id.</u> § 1189(a)(5).

Thus, courts have routinely rejected claims that Section 2339B violates the nondelegation clause.  <u>See</u>, <u>e.g.</u>, <u>Taleb-Jedi</u>, 566 F. Supp. 2d at 172; <u>see also</u> <u>United States v. Chandia</u>, 514 F.3d 365, 371 (4th Cir. 2007); <u>United States v. Hammoud</u>, 381 F.3d 316, 331 (4th Cir. 2004) (en banc); <u>United States v. Bozarov</u>, 974 F.2d 1037, 1041-45 (9th Cir. 1992); <u>United States v. Augustine</u>, 2020 WL 9199944, at *10-11 (E.D.N.Y. Sept. 8, 2020) (Report & Recommendation, adopted at 2021 WL 1381060).  <u>United States v. Assi</u>, 414 F. Supp. 2d 707, 726 (E.D. Mich. 2006).

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court

deny the defendant's motion.

Dated:       Brooklyn, New York
              October 1, 2021

                                 JACQUELYN M. KASULIS
                                 Acting United States Attorney
                                 Eastern District of New York

                  By:    /s/ Jonathan E. Algor
                            Jonathan E. Algor
                            Assistant U.S. Attorney
                            (718) 254-7000