DMP:JEA/ES
F.#2019R01179

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                         Docket No. 20-CR-135 (CBA)

AWAIS CHUDHARY,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - -X


THE GOVERNMENT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTIONS *IN LIMINE*


BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Jonathan E. Algor
Ellen Sise
Assistant U.S. Attorneys
     (Of Counsel)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...........................2

    The Islamic State of Iraq and Al-Sham (ISIS) ...............................2

    The Defendant's Attempt to Commit a Terrorist Attack for ISIS...3

    The Defendant's Arrest……………………………………………9

    The Defendant's Criminal Case ………………………………...9

ARGUMENT ......................................................................................10

    I.    An Anonymous Jury Is Appropriate in This Case ...............10

    II.   The Court Should Permit the Government to Use Certain Measures to Protect the Identity of Testifying Undercover Law Enforcement Officers ....................................................................17

    III.   The Court Should Preculde the Defendant From Offering Evidence and Argument Concerning the Defendant's Possible Punishment.................................................................................22

    IV.   The Defendant's Self-Serving Post-Arrest Statements Should Be Excluded As Hearsay.............................................................24

CONCLUSION ...................................................................................27

# TABLE OF AUTHORITIES

**Cases**

Alvarado v. Burge, No. 05-CV-1851 (AKH), 2006 WL 1840020 (S.D.N.Y. 2006) ............ 19

Ayala v. Speckard, 131 F.3d 62, 72 (2d Cir. 1997).................................................... 18, 19, 20

Brady v. Maryland, 373 U.S. 83 (1963) ................................................................. 21

Delaware v. Van Arsdall, 475 U.S. 673 (1986)............................................................ 20

Giglio v. United States, 405 U.S. 150 (1972)........................................................... 21

Nelson v. Crowley, No. 07-CV-849 (RJS), 2009 WL 498909 (S.D.N.Y. 2009) .................. 19

Rosales-Lopez v. United States, 451 U.S. 182 (1981) ..................................................... 16, 17

Roviaro v. United States, 353 U.S. 53 (1957) ................................................................. 18, 21

Shannon v. United States, 512 U.S. 573, 579 (1994) ......................................................... 23

United States ex rel. Lloyd v. Vincent, 520 F.2d 1272, 1274 (2d Cir. 1975).................. 18, 19

United States v. Abu Marzook, 412 F. Supp. 2d 913 (N.D. Ill. 2006) .................................. 18

United States v. Ahmed, No. 12 CR 661 (SLT), 2014 WL 6983438 (E.D.N.Y. Dec. 10, 2014) .................................................................................................................... 10

United States v. al Farekh, No. 15 CR 268 (BMC) (E.D.N.Y. 2017) .................................. 10

United States v. Al Fawwaz, No. 98 CR 1023 (LAK), 2014 WL 5005917 (S.D.N.Y. 2014) .................................................................................................................. 10, 11

United States v. Augustine, 18-CR-393 (SJ) (E.D.N.Y. 2021) ............................................. 13

United States v. Aulicino, 44 F.3d 1102 (2d Cir. 1995).................................................. 11, 15

United States v. Barnes, 604 F.2d 121 (2d Cir. 1979)......................................... 12, 15, 16, 17

United States v. Black, No. 13 CR 316, 2014 WL 5783067 (E.D.N.Y. 2014) ..................... 25

United States v. Blume, 967 F.2d 45 (2d Cir. 1992) ............................................... 24

United States v. DiMarzo, 80 F.3d 656 (1st Cir. 1996)................................................ 24

United States v. Edwards, 631 F.2d 1049 (2d Cir. 1980)...................................................... 23

United States v. El-Mezain, 664 F.3d 467 (5th Cir. 2011) .............................................. 18, 21

United States v. Gotti, 459 F.3d 296 (2d Cir. 2006) ......................................................... 11, 16

United States v. Hausa, No. 12 CR 134 (BMC) (E.D.N.Y. 2016) ........................................ 10

United States v. Hernandez, No. 12-CR-809 (S-1) (PKC), 2013 WL 3936185 (S.D.N.Y. 2013) ....................................................................................................................... 18

United States v. Ibrahim, 529 F. App'x 59 (2d Cir. 2013) ................................................ 10

United States v. Kadir, 718 F.3d 115 (2d Cir. 2013) ................................................ 10, 11, 15

United States v. Kasimov, 15-CR-95 (WFK) (E.D.N.Y. 2019) ...................................... 10, 13

United States v. Kaziu, 559 F. App'x 32 (2d Cir. 2014) .................................................. 10, 16

United States v. Khan, 591 F. Supp. 2d 166 (E.D.N.Y. 2008) ........................................... 11

United States v. Lewis, 110 F.3d 417 (7th Cir. 1997) ....................................................... 24

United States v. Marin, 669 F.2d 73 (2d Cir. 1982) ........................................................ 25

United States v. Naseer, 10 CR 19 (RJD) (E.D.N.Y. 2014) ................................. 10, 18, 19, 20

United States v. Paccione, 949 F.2d 1183, 1193 (2d Cir. 1991) ...................................... 15, 16

United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987) .................................................. 15

United States v. Pica, 692 F.3d 79 (2d Cir. 2012) ........................................................... 11

United States v. Pugh, No. 15 CR 116 (NGG), 2015 WL 8481877 (E.D.N.Y. 2015) .... 10, 11, 13, 18

United States v. Quansah, No. 05-50073-CR, 2006 WL 620755 (9th Cir. 2006) .................. 25

United States v. Quinones, 511 F.3d 289, 296 (2d Cir. 2007) ......................................... 11, 13

United States v. Stewart, 590 F.3d 93, 125 (2d Cir. 2009) .............................................. 10, 14

United States v. Thai, 29 F.3d 785 (2d Cir. 1994) ..................................................... 15, 16, 17

United States v. Thomas, 757 F.2d 1359 (2d Cir. 1998) ........................................... 12, 14, 24

United States v. Tomero, 486 F. Supp. 2d 320 (S.D.N.Y. 2007) ........................................ 11

United States v. Tutino, 883 F.2d 1125 (2d Cir. 1989) .............................................. 11, 15, 16

United States v. Urena, 8 F. Supp. 3d 568 (S.D.N.Y. 2014) .................................................. 21

United States v. Vario, 943 F.2d 236 (2d Cir. 1991) ................................................... 15, 17

United States v. Vrancea, No. 13-CR-0316, 2013 WL 549099 (E.D.N.Y. 2013) ................. 25

United States v. Watts, 934 F. Supp. 2d 451 (E.D.N.Y. 2013) ............................................ 23

United States v. Wilkerson, 84 F.3d 692 (4th Cir. 1996) ................................................... 25

**Statutes**

Title 18, United States Code, Section 2339B ...................................................................... 1, 9

**Other Authorities**

Sand et al., Modern Federal Jury Instructions, Instruction 9-1 (2017 ed.) ........................... 23

**Rules**

Federal Rule of Evidence 403 ............................................................................................. 23

Federal Rule of Evidence 401 ............................................................................................. 23

Federal Rule of Evidence 801(d)(2)(A) .............................................................................. 25

## PRELIMINARY STATEMENT

Defendant Awais Chudhary sought to conduct a terrorist attack in Queens, New York, in support of the Islamic State of Iraq and al-Sham ("ISIS").  After watching violent terrorist propaganda videos, the defendant sought guidance from individuals whom he believed to be ISIS supporters in his quest to conduct a knife and/or bomb attack so that he could further ISIS's terrorist aims.  The defendant ordered a tactical knife and tactical gear from Amazon for his attack.  He was stopped by law enforcement as he attempted to retrieve the tactical knife and other gear at an Amazon locker in Queens, New York.  Following his arrest, the defendant was charged in an Indictment with attempting to provide material support to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B. Trial is scheduled to begin on March 21, 2022.

The government respectfully moves in limine to request that the Court (i) select an anonymous jury, and direct that the names, addresses, and workplaces of members of both the venire and the petit jury not be revealed to the parties; (ii) authorize the government to use certain measures to protect the identity and security of the undercover law enforcement officers who are expected to testify at trial; (iii) preclude the defendant from offering evidence and argument concerning the defendant's possible punishment; and (iv) preclude the defendant from introducing self-serving statements in the form of inadmissible hearsay or to cross-examine certain government witnesses to elicit the defendant's exculpatory hearsay statements.

FACTUAL AND PROCEDURAL BACKGROUND

The Islamic State of Iraq and Al-Sham (ISIS)

On or about October 15, 2004, the U.S. Secretary of State designated al Qaeda in Iraq ("AQI") then known as Jam 'at al Tawhid wa' al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.  On May 15, 2014, the Secretary of State amended the designation of AQI as a Specially Designated Global Terrorist entity under Section 1(b) to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham (abbreviated as ISIS, which is how the FTO is referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al-Islamiya, and Al-Furquan Establishment for Media Production.  On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS.  To date, ISIS remains a designated FTO.

On or about September 21, 2014, ISIS spokesperson Abu Muhammad al-Adnani issued a recorded statement calling for attacks against citizens – civilians or military – of the countries participating in the United States-led coalition against ISIS.

ISIS members and associates have made public statements and issued public declarations, which, among other things, (i) proclaimed and acknowledged that ISIS had committed acts of violence; (ii) threatened future acts of violence if ISIS's demands were not met; and (iii) were intended to promote and foster the prestige and standing of ISIS.  Since 2013, ISIS supporters have claimed credit for numerous terrorist activities, including multiple attacks against Americans in the United States and against Westerners abroad, and have

2

publicly expressed a desire to continue to target and attack the United States and the West. ISIS supporters have claimed responsibility for several attacks in the United States, including: the May 2015 shooting in Garland, Texas, at an exhibition featuring cartoons of the Prophet Mohammed; the December 2015 shooting in San Bernardino, California, at the Inland Regional Center; and the June 2016 shooting in Orlando, Florida, at the Pulse nightclub.

ISIS and its supporters have also claimed responsibility for many violent attacks in Europe and South Asia, including: the November 2015 shootings and suicide bombings in Paris, France, at the Bataclan concert hall, a sports stadium, and several restaurants; the July 2016 truck attack in Nice, France during Bastille Day celebrations; the December 2016 truck attack in Berlin, Germany at a Christmas market; the May 2017 suicide bombing in Manchester, United Kingdom at a concert; the August 2017 van attack in Barcelona, Spain; an August 2018 suicide bombing in Kabul, Afghanistan; and the Easter Sunday 2019 series of suicide bombings in Sri Lanka.

To gain supporters, ISIS spreads its messages using social media, Internet platforms, and email. Using these platforms, ISIS posts and circulates videos and updates of events in Syria, Iraq, and other ISIS-occupied areas, in English, Arabic, and other languages, to draw support to its cause. ISIS has disseminated a wide variety of recruiting materials and propaganda through social media, which includes photographs and videos depicting ISIS activities, including beheadings and other atrocities, as well as audio and video lectures by members of ISIS and members of other Islamic extremist organizations.

The Defendant's Attempt to Commit a Terrorist Attack for ISIS

In August 2019, the defendant began communicating with law enforcement officers acting in an undercover capacity (the "UCs") based on the defendant's desire and plans

to conduct a knife and/or bomb attack in Queens, New York, on behalf of ISIS. The defendant communicated online and through text messaging with two UCs ("UC-1" and "UC-2").

Throughout his communications with UC-1 and UC-2, the defendant repeatedly expressed his support for ISIS and stated that he wanted to conduct a knife or bomb attack in Queens, New York, in locations such as the pedestrian bridges over the Grand Central Parkway to the Flushing Bay Promenade (the "Promenade") and the New York World's Fair marina located in the Promenade, and to record his attack in order to inspire others to perform similar attacks.

On or about August 23, 2019, the defendant requested a video and information from UC-1 regarding the "proper knife" for committing a stabbing attack. The defendant also asked UC-1 for information regarding "how not to leave traces of finger prints, DNA, etc."[1] When UC-1 asked the defendant to send photographs of the locations that he was considering for an attack, the defendant explained that he did not have a "proper knife" for the attack and needed to know the name of the type of knife required to successfully complete an attack. The defendant noted that he had viewed an image of "the ideal knife" which had a hand guard but he did not know its name. The defendant also sent one of the UCs a screenshot of a document with the words "Islamic Stat[e]" at the top and the subheadings "Places to Strike," "The Ideal Knife," and "Knives to Avoid." The document the defendant sent further included a diagram of the human body depicting where to stab victims with a knife.

The defendant explained that he needed this information because he was "in the west" and that he was asking Allah to, among other things, "not let us get caught or imprisoned,

---

[1]    Communications quoted herein have not been edited to correct grammatical and/or spelling errors, except where indicated in brackets.

for indeed the entire plot belongs to Allah alone." The defendant further told UC-1 that he had pledged his allegiance to ISIS's leader Abu Bakr al Baghdadi[2]—specifically that he had given "ba'yah to Ameer al-Mu'mineen"[3]—and that he wanted to commit an attack as a "lone wolf."

During that same conversation on August 23, 2019, the defendant noted that he intended to commit a knife attack because "that's what [he] know[s]," but that he would consider conducting a bombing attack if UC-1 instructed him "on how to build a bucket bomb." The defendant stated that he wanted to know the best way to make a bomb so that it was "swift with no traces left behind." He also discussed the use of a bucket bomb to "target multiple vehicles" and possible targets for a bombing attack, which included a "mini bridge over a busy rode with many cars" or a "quiet and darker area that's near a wide river where people pass."

The defendant thereafter explained that he had taken videos of various locations an hour earlier and was sending them to UC-1. He told UC-1 that the videos depicted the bridge he mentioned earlier and that he "was thinking about simply throwing bucket bombs or several light weight bombs as the car over the fencing" but he did not know how to construct them. The defendant also told UC-1 that he would send a different video depicting the "knife area" where he intended to conduct an attack, but the video files were too large because he had

---

[2] Abu Bakr al Baghdadi, also known as "Ameer al-Mu'mineen" was the leader of ISIS from 2014 until his death in 2019. In 2011, the U.S. Department of State designated al-Baghdadi as a Specially Designated Global Terrorist under Executive Order 13224. Under al-Baghdadi, ISIS was responsible for thousands of deaths of civilians in the Middle East, including the brutal murders of civilian hostages from Japan, the United Kingdom and the United States.

[3] Bay'ah is an Islamic practice of declaring one's allegiance or an oath to a particular leader.

recorded them with his cellphone.  UC-1 thereafter instructed the defendant to send the videos to another account which was controlled by UC-2.

The defendant then sent multiple videos of his proposed attack locations to UC-2, including video files that depicted a bridge and other videos titled "First Portion after bridge" and "Third Portion after bridge."  The videos show the pedestrian bridges over the Grand Central Parkway to the Promenade in Queens.  The defendant also sent UC-2 two videos depicting bomb attacks.  After sending the first video, the defendant explained that the bomber depicted in the video was "what I mean by bucket bomb or something hefty as you see he placed it and then moved away for its hefty explosion for the grace of Allah."  He then sent the second video and noted "this is what I mean by a light weight easy to carry explosive" and asked UC-2 to watch the videos so that UC-2 could provide guidance on whether the bombs would be suitable for the defendant's proposed attack locations.  A review of the videos sent by the defendant shows that at least one of the videos appeared to be produced by ISIS, featuring a graphic of an ISIS flag in the upper left-hand corner.

The next day, the defendant continued his communications with UC-1.  The defendant told UC-1 that he selected his proposed attack locations because they have "easier escape routes" and "more room for [his] scooter."  The defendant thereafter explained his timeline for procuring supplies to conduct an attack and noted that he wanted to start with a knife because buying materials for explosives "bring suspicion by the crusaders and their miserable worshippers."  He also stated that he had searched Amazon's website for the knife he wanted to use in his attack but could not find the "proper knife" and asked UC-1 for suggestions and whether he needed gloves and a mask.  After UC-1 sent him a photograph of a knife, the defendant responded that "buying a knife like this draws attention."  The defendant

also sought guidance on the use of "medical latex gloves" during an attack and whether they would "not leave finger prints and DNA." He also asked for training videos to show "how to effectively use [a] knife and training in general . . . as training for Jihad for Allah is worship in itself." Finally, the defendant noted during his conversations with the UCs that he considered committing the attack "near one of the Masjids and then enter the Masjid for changing clothes," where there was "a lot of darkness" and he could "wait therein if their police forces or army – woe to them – come, as they do after an attack by the Khilafah," and to leave his backpack and scooter to retrieve them later.[4]

As noted above, the defendant sent the UCs various videos depicting reconnaissance that the defendant had previously conducted of proposed attack locations. On or about August 24, 2019, law enforcement officers conducted surveillance of the defendant and observed him exit his residence in Queens and proceed on foot to the area in and around the Promenade. The surveilling agents observed the defendant enter the Promenade and take videos and photographs of the area with a cellphone, sometimes in a surreptitious manner by holding the cellphone close to his chest.

The surveilling agents also observed the defendant taking videos and/or photographs of, among other locations, parts of the Promenade, the World's Fair marina, a security gate leading to the marina, a gas station and donut shop located in or around the Promenade, and a security camera located in the vicinity of the donut shop.

---

[4] As relevant here, "Masjid" and "Khilafah" are Arabic words for a mosque and caliphate respectively. One of ISIS' primary goals is to form an Islamic state or "caliphate" in conquered territory.

The defendant's communications with the UCs continued in subsequent days during which he took further steps in his plan to conduct an attack on behalf of ISIS. On or about August 25, 2019, the defendant and UC-1 discussed purchasing through the Amazon website different items for the attack, including, among others, several knives, a strap for the defendant's cellphone, gloves, a mask, and tactical clothing. The strap for the cellphone was so the defendant could record his attack. UC-1 thereafter provided the defendant with an Amazon account, preloaded the account with money and, based on the defendant's requests, placed the following items in the shopping cart: (a) an 11-inch black "Fixed Blade Tactical Knife"; (b) a nine-inch high carbon "Fixed Blade Knife"; (c) a two-piece "Tactical Combat Survival Hunting & Neck Knives"; (d) a cellphone chest and head strap; (e) a polo shirt; (f) tactical lightweight assault cargo pants; (g) a black face mask; and (h) a pair of "covert Tactical" gloves. In response, the defendant sent UC-1 two screenshots of two knives and informed UC-1 that he was "having difficulty choosing between them."

Later that day, the defendant sent UC-1 a screenshot indicating that he had ordered a "420 High Carbon Stainless Steel Fixed Blade Survival Tactical Knife," but the defendant eventually canceled that order because he wanted to have it delivered more quickly. The defendant subsequently informed UC-1 that he had found "one with a serrated edge," and sent UC-1 a screenshot which depicted an order from Amazon including, among other things, khaki-colored pants, a mask, a strap, and gloves. The defendant explained to UC-1 that the items would be delivered on Wednesday, August 28, 2019, and that he would use the Amazon delivery location in the Shops at Skyview Center in Queens. A review of the Amazon order shows that the defendant purchased the following: (a) a 420 High Carbon Stainless Steel Fixed Blade Survival Tactical Knife; (b) a cellphone chest and head strap; (c) tactical lightweight

assault cargo pants; (d) a black face mask; and (e) a pair of "Hard Knuckle Full Finger Tactical Gloves."

The Defendant's Arrest

On August 29, 2019, law enforcement officers conducted surveillance and observed the defendant depart his residence and travel to the Shops at Skyview Center in Queens.  Law enforcement officers further observed the defendant approach an Amazon locker.  The defendant was arrested as he attempted to open the locker.

The Defendant's Criminal Case

On August 30, 2019, the defendant was charged by complaint with attempting to provide material support and resources to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B(a)(1).  On March 12, 2020, a grand jury sitting in the Eastern District of New York returned an indictment charging the defendant with one count of attempting to provide material support and resources to a foreign terrorist organization, in violation of the same statute.  The Indictment charges:

> In or about August 2019, within the Eastern District of New York and elsewhere, the defendant AWAIS CHUDHARY did knowingly and intentionally attempt to provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), including services and personnel, including himself, to a foreign terrorist organization, to wit: the Islamic State of Iraq and al-Sham ("ISIS"), which, at all relevant times was designated by the Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act, knowing that ISIS was a designated foreign terrorist organization and that ISIS had engaged in and was engaging in terrorist activity and terrorism.

(Title 18, United States Code, Sections 2339B(a)(l) and 3551 et seq.)

9

ARGUMENT

I.    An Anonymous Jury Is Appropriate in This Case

Courts in this District have routinely approved the use of anonymous juries in terrorism cases.[5]  The Second Circuit has repeatedly upheld the use of anonymous juries where (1) there is strong reason to believe that the jury needs protection, and (2) reasonable precautions have been taken to minimize any adverse effect on the jurors' opinion of the defendants.  See, e.g., Kaziu, 559 F. App'x at 37-38; United States v. Arillotta, 529 F. App'x 81, 82 (2d Cir. 2013); Ibrahim, 529 F. App'x at 65; Kadir, 718 F.3d at 120-21.  "Within these

---

[5] See, e.g., United States v. Kaziu, 559 F. App'x 32, 37-38 (2d Cir. 2014) (upholding use of anonymous jury in prosecution for conspiracy to commit murder overseas and attempted provision of material support to the terrorist organization al-Shabaab); United States v. Ibrahim, 529 F. App'x 59, 65 (2d Cir. 2013) (affirming use of anonymous jury in case relating to plot to detonate fuel tanks at John F. Kennedy airport); United States v. Kadir, 718 F.3d 115, 121 (2d Cir. 2013) (affirming use of anonymous jury in case relating to terrorist plot at John F. Kennedy airport); United States v. Kasimov, 15-CR-95 (WFK), ECF No. 398 (E.D.N.Y. Sep. 11, 2019) (granting government's request for an anonymous, partially sequestered jury in case involving defendant charged with conspiring and attempting to provide material support to ISIS); United States v. al Farekh, No. 15 CR 268 (BMC), ECF No. 102 (E.D.N.Y. June 16, 2017) (granting government's request for an anonymous jury in case involving defendant, an al-Qaeda member, charged with conspiracy to murder U.S. nationals among other terrorism offenses); United States v. Hausa, No. 12 CR 134 (BMC), ECF No. 123 (E.D.N.Y. June 20, 2016) (granting government's request for an anonymous jury in case involving defendant charged with providing material support to al-Qaeda); United States v. Pugh, No. 15 CR 116 (NGG), 2015 WL 8481877 (E.D.N.Y. Dec. 9, 2015) (granting government's motion for an anonymous, partially sequestered jury in trial of defendant accused of providing material support to the Islamic State); United States v. Naseer, 10 CR 19 (RJD), Dkt. No. 361 (E.D.N.Y. Dec. 30, 2014) (approving use of anonymous jury where defendant was charged with conspiring to provide material support to al-Qaeda); United States v. Ahmed, No. 12 CR 661 (SLT), 2014 WL 6983438 (E.D.N.Y. Dec. 10, 2014) (approving use of anonymous jury in terrorism trial); see also United States v. Stewart, 590 F.3d 93, 125 (2d Cir. 2009) (affirming use of anonymous jury in prosecution  in the Southern District of New York of defense attorney and two co-conspirators for involvement with Sheikh Omar Abdel Rahman); United States v. Al Fawwaz, No. 98 CR 1023 (LAK), 2014 WL 5005917 (S.D.N.Y. Sept. 30, 2014) (granting government's request for an anonymous jury in prosecution relating to plot to bomb at the U.S. embassies in Kenya and Tanzania).

parameters, the decision whether or not to utilize an anonymous jury is left to the district court's discretion." United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012) (quoting United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006)).

"In determining whether there is a 'strong reason' to believe that the jury needs protection, courts should consider several factors, including whether (1) the charges against the defendants are serious, (2) there is a substantial potential threat of corruption to the judicial process, and (3) considerable media coverage of the trial is anticipated." Al Fawwaz, 57 F. Supp. 3d at 309 (citing United States v. Quinones, 511 F.3d 289, 296 (2d Cir. 2007), and United States v. Tomero, 486 F. Supp. 2d 320, 322 (S.D.N.Y. 2007)); see also Pugh, 2015 WL 8481877, at *2 (same). While "it is unclear whether any of these factors individually justify impaneling an anonymous jury," "there are numerous cases indicating that anonymity is appropriate when some combination of these factors is present." Pugh, 2015 WL 8481877, at *2 (quoting United States v. Khan, 591 F. Supp. 2d 166, 169 (E.D.N.Y. 2008) (citing Quinones, 511 F.3d at 296)).

Although empaneling an anonymous jury presents "the possibility of unfair prejudice to the defendant," United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989), "the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a voir dire designed to uncover any bias as to the issues or the defendant[] and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities," United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); see also Kadir, 718 F.3d at 120. "The Second Circuit has consistently 'made clear that when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights.'" Pugh, 2015 WL 8481877, at *2 (quoting Kadir, 718 F.3d at 120).

11

In United States v. Barnes, the Second Circuit upheld the empaneling of an anonymous jury and specifically rejected any claim that the law requires jurors to disclose their identities:

> If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If the anonymous juror feels less pressure as a result of anonymity . . . this is as it should be a factor contributing to his impartiality.

604 F.2d 121, 140-41 (2d Cir. 1979) (noting further that "in a case that generated as much pretrial publicity as [this one] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities.").

Similarly, in United States v. Thomas, the Second Circuit explained that the protection of jurors is vital to the proper functioning of the federal criminal justice system, describing jury anonymity as a mechanism to ensure a fair and impartial verdict, free from fear or intimidation:

> As a practical matter, we cannot expect jurors to "take their chances" on what might happen to them as a result of a guilty verdict. Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict. Justice requires that when a serious threat to juror safety reasonably is found to exist, precautionary measures must be taken.

757 F.2d 1359, 1364 (2d Cir. 1998).

As noted above, the key factors in determining whether a jury should be anonymous are (1) the seriousness of the charges against the defendant; (2) the potential threat of corruption of the judicial process; and (3) the expectation of publicity. See, e.g.,

Quinones, 511 F.3d at 296.  As described below, these factors favor empaneling an anonymous jury in this case.

A.    The Charges in This Case Are Serious

The defendant faces serious charges.  Chudhary is accused of attempting to support ISIS, a terrorist organization that has claimed responsibility for vicious, violent attacks in numerous countries, including within the United States.  If convicted at trial, the defendant will face an effective range under the United States Sentencing Guidelines of 240 months imprisonment (the statutory maximum sentence) on the terrorism charge.

Courts in this district have regularly approved anonymous juries in cases involving similarly serious charges.  Indeed, the charges at issue in this case carry similar penalties to those charged in terrorism-related cases in this District in which an anonymous jury was used.  See, e.g., United States v. Augustine, 18-CR-393 (SJ), ECF No. 152 (E.D.N.Y. Apr. 14, 2021) (anonymous jury authorized in case involving defendant charged with one count of attempting to provide material support of terrorism); see also Kasimov, 15-CR-95 (WFK), ECF No. 398 (E.D.N.Y. Sep. 11, 2019) (anonymous and partially sequestered jury authorized in case involving defendant charged with one count of conspiring to provide material support of terrorism and one count of attempting to do the same); Pugh, 2015 WL 8481877 (anonymous and partially sequestered jury authorized in case in which the defendant was charged with one count of attempted material support of terrorism and one count of obstruction of justice).

B.    The Judicial Process Is at Risk

In addition to the seriousness of the charges facing the defendant, an anonymous jury is also warranted because of the risk of interference with the judicial

process.  As noted above, the defendant is accused of attempting to conduct a lone wolf attack in support of ISIS.  Many jurors will be aware of ISIS's global campaign of violence. As noted above, ISIS has claimed responsibility—and/or the perpetrator(s) have claimed to be acting on behalf of ISIS—for attacks in the United States, Europe, and Africa.  Despite the degradation of ISIS's geographical control of territory in Syria and Iraq, most jurors will know or believe that ISIS remains operational and committed to violently attacking U.S. and other Western interests.

As the Second Circuit has stated, "even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict."  Thomas, 757 F.2d at 1364. There is a legitimate concern in this case that jurors may fear that an associate of the defendant—accused to be a supporter of ISIS—or a member of another Islamist extremist group will target them.  It would not be unreasonable for jurors to believe that disclosure of their identities or information about their families or workplaces may expose them to unnecessarily heightened risk.  See Stewart, 590 F.3d at 125 (noting "the reasonable likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety").

C.    There Has Been Publicity Surrounding the Case

An anonymous jury is also warranted because of the media attention this case has already generated and the publicity likely to result from trial.  Major media sources have reported regarding this case.  Given the level of media attention and public scrutiny that this case has generated and will generate, it is reasonably foreseeable that the trial, including the jurors' identities, may be the subject of media coverage.  It is also conceivable that

14

individuals sympathetic to the defendant (or to his cause) or hostile to the government may seek to obtain information about the jurors.

The Second Circuit has repeatedly held that the expectation of publicity at trial weighs in favor of anonymity to avoid the jurors' exposure "to inappropriate contacts that could compromise the trial." See United States v. Paccione, 949 F.2d 1183, 1193 (2d Cir. 1991); see also United States v. Thai, 29 F.3d 785, 801 (2d Cir. 1994); United States v. Vario, 943 F.2d 236, 240 (2d Cir. 1991); Tutino, 883 F.2d at 1132; United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987); Barnes, 604 F.2d at 141. Juror anonymity is an effective remedial measure to prevent possible prejudice and inappropriate contact by the press.

Moreover, potential jurors will be more willing to serve if they are confident that they and their families will not be subjected to scrutiny, harassment and possible threats. See Barnes, 604 F.2d at 141 (upholding anonymous jury and explaining that in a case with "much pretrial publicity" and "allegations of dangerous and unscrupulous conduct," "precaution was best taken so that fears would not become realities"). The media's interest in this case clearly "militate[s] in favor of an anonymous jury." Vario, 943 F.2d at 240.

D. An Anonymous Jury Will Not Prejudice the Defendant

The defendant will not be prejudiced by the use of an anonymous jury. As noted above, the use of an anonymous jury does not infringe on a defendant's rights provided that (1) "the jurors [are given] a plausible and nonprejudicial reason for not disclosing their identities"; and (2) "the court conducts a voir dire designed to uncover any bias as to the issues or the defendants." Aulicino, 44 F.3d at 1116; see also Kadir, 718 F.3d at 120.

Here, the jurors may accurately be informed that these protective measures are being taken due to anticipated media interest, to prevent any arguable inference that the

defendant poses a danger to them.  See Gotti, 459 F.3d at 345 (upholding use of anonymous jury and finding that prejudice was avoided by "instructing the jury that the special precautions had been implement to protect them from the media"); see also Thai, 29 F.3d at 801 ("In order to provide a nonprejudicial reason for maintaining anonymity, the introduction to the [jury] questionnaire stated, with approval of the parties, that '[s]electing an anonymous jury is not an unusual practice and has been followed in many cases in the Federal Court.  Anonymity will ward off curiosity that might infringe on juror's privacy[.]'"); Paccione, 949 F.2d at 1193 (upholding anonymous jury and finding that the court "adequately instructed the jury at the outset of the trial that the special precautions were designed to protect the jury from contacts by the media, thereby implying that the security measures were not the result of threats from the defendants"); Tutino, 883 F.2d at 1133 (upholding anonymous jury procedure where the jury was instructed that "It is a common practice followed in many cases in Federal court to keep the names and identities of the jurors in confidence.  This is in no way unusual."); see also Kaziu, 559 F. App'x at 38 ("the district court told jurors that their identities were being hidden only because of the extensive media coverage and did not implicate Kaziu's dangerousness").  Thus, in keeping with Second Circuit precedent, the Court can eliminate any potential prejudice to the defendant by issuing an instruction informing the jury in a neutral manner that anonymity is necessary to protect them from the media, and that selection of anonymous juries is not an unusual procedure.

Furthermore, the use of an anonymous jury does not conflict with the defendant's right to conduct meaningful voir dire.  See Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981).  As the Second Circuit explained in Barnes:

> [A]s long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal.

604 F.2d at 140. The trial court has substantial discretion in controlling and limiting the voir dire process. See Rosales-Lopez, 451 U.S. at 189; Barnes, 604 F.2d at 137. Accordingly, a full voir dire may be conducted about subjects other than the juror's name, address and employer's name, and the parties and counsel have an unrestricted opportunity to observe the jurors during this process. See, e.g., Barnes, 604 at 142-43.

In the anonymous jury context, the Second Circuit has frequently noted that a defendant's rights are protected by the district court's conduct of "a voir dire designed to uncover bias as to issues in the cases and as to the defendant[s]." Vario, 943 F.2d at 242 (quoting Barnes, 604 F.2d at 140); see also Thai, 29 F.3d at 801.

Accordingly, under the circumstances presented, empaneling an anonymous jury will not prejudice the defendant.

II.    The Court Should Permit the Government to Use Certain Measures to Protect the Identity of Testifying Undercover Law Enforcement Officers

Next, the government moves the Court to: (1) permit the UCs to testify under aliases rather than disclose their true identities and preclude the defendant from inquiring into the UCs' places of residence and whereabouts of the UCs' families; (2) provide a live audio feed of the UCs' testimony to be broadcast to another public location within the courthouse and allow only the judge, jury, defendant and counsel, the government trial team and essential court personnel to be present during testimony; (3) bar disclosure of and cross-examination concerning the UCs' true identities; (4) permit the UCs to testify while using light disguises; (5) prohibit all non-official recording and photographic devices from the courtroom during the

UCs' testimony; (6) direct the UCs' non-public entrance and egress from the courtroom; and (7) preclude the defendant from inquiring into other investigations by the UCs that are unrelated to the defendant.

The Second Circuit has repeatedly recognized the government's strong interest in protecting the identities of undercover agents and other confidential witnesses based on concerns for their safety and the desire to enable their continued work on ongoing and future investigations. See, e.g., Ayala v. Speckard, 131 F.3d 62, 72 (2d Cir. 1997) ("The state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest . . . ."); United States ex rel. Lloyd v. Vincent, 520 F.2d 1272, 1274 (2d Cir. 1975) (recognizing the strong government interest in protecting the identities of undercover agents).

The use of an alias and a light disguise by a testifying witness is permissible when the government's interest in maintaining the anonymity of its witness outweighs the defendant's interest in confronting the witnesses without limitation. See Roviaro v. United States, 353 U.S. 53 (1957). Courts in this district and elsewhere have been especially willing to permit the use of an alias in cases where the disclosure of a testifying law enforcement officer's real identity would endanger the safety of the officer or create national security concerns. See Pugh, 15-CR-116 (Dkt. Entry No. 99); Naseer, No. 10-CR-19 (S-4) (Dkt. Entry No. 382); United States v. Hernandez, No. 12-CR-809 (S-1) (PKC), 2013 WL 3936185 (S.D.N.Y. July 29, 2013); United States v. El-Mezain, 664 F.3d 467, 491 (5th Cir. 2011); United States v. Abu Marzook, 412 F. Supp. 2d 913, 916 (N.D. Ill. 2006).

Courts have held that permitting law enforcement testimony under a shield or badge number does not necessarily curtail a defendant's trial rights because "[t]he cross-examiner can question the witness' activities in the . . . operation without regard to the witness'

name, and similarly has an opportunity to see and hear that which he testifies about." <u>Alvarado v. Burge</u>, No. 05-CV-1851 (AKH), 2006 WL 1840020, at *2 (S.D.N.Y. June 30, 2006). The same analysis applies to testimony under a pseudonym. As Judge Dearie observed in permitting undercover officers from the United Kingdom Security Service to testify using pseudonyms in a terrorism trial:

> Here, the defendant will not be deprived of his right to confront these witnesses and cross-examine them—he will be free to cross-examine them on all topics other than their identity. Nothing about the witnesses' true names goes to their credibility or knowledge regarding the subject of their testimony. As in other cases where government officers were permitted to testify pseudonymously, here, an officer's "true name is immaterial to defendant's guilt or innocence."

<u>Naseer</u>, 10-CR-19 (S-4) (Dkt. Entry No. 382 at 6) (citation omitted); <u>see also</u> <u>Nelson v. Crowley</u>, No. 07-CV-849 (RJS), 2009 WL 498909, at *5 (S.D.N.Y. Feb. 23, 2009) (observing that anonymous testimony by undercover officer did not violate Confrontation Clause's prohibition against anonymous accusers and absentee witnesses).

The Court should authorize the requested protective measures because of the government's interests in protecting the integrity of ongoing national security investigations and ensuring the UCs' safety and continued ability to work in an undercover capacity.

As the Second Circuit has repeatedly noted, "[t]he state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest." <u>Ayala</u>, 131 F.3d at 72; <u>see also</u> <u>Lloyd</u>, 520 F.2d at 1274 (recognizing persuasive "interest of the state and of the witnesses in preserving the confidentiality of undercover agents"). That is particularly true in this case, where the UCs has worked on highly sensitive national security investigations, some of which involve designated foreign terrorist organizations that are bent

on causing harm to the United States.  The fact that the UCs may face retribution for the UCs work from violent global terrorist groups is a separate and sufficient basis to protect the UCs' identities.  These safety concerns are particularly acute in light of ISIS's history of extreme violence.  The Second Circuit has emphasized that there is "no requirement that the prosecution must prove that particular individuals likely to attend the trial will disclose the officer's identity[.]"  Ayala, 131 F.3d at 72.  While the presence of any individuals in the courtroom, including the defendant and his immediate family members, poses a risk that those individuals will describe the UC to others, the Second Circuit has nonetheless recognized that "the right to a public trial does not require the further risk that the officer's identity will become known through observation by members of the public who might enter the courtroom and see the officer testifying."  Id.

    With respect to the UCs' identities, while the Sixth Amendment guarantees a defendant the right to cross-examine adverse witnesses, that right is not unlimited, and trial courts retain "wide latitude" to restrict cross-examination "based on concerns about, among other things . . . the witness's safety."  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). Here, there will be minimal impact on the defendant's ability to cross-examine the UCs as a result of not being permitted to inquire into the UCs' true names, their places of residence, and the location of the UCs' families.  See Naseer, No. 10-CR-19 (S-4) (E.D.N.Y. Jan. 26, 2015) (Docket Entry No. 382 at 6) ("Nothing about the witnesses' true names goes to their credibility or knowledge regarding the subject of their testimony.").  The use of a pseudonym rather than the UCs' true names will not deprive the defendant of the ability to confront the UCs or to challenge the substance of the UCs' testimony.  When the government's substantial interests in protecting its ongoing national security investigations and the identity and safety of the UCs

are balanced against the defendant's right to confront the witnesses against him, see generally Roviaro, 353 U.S. at 62, "the scale tips in the favor of maintaining secrecy of the witness['s] name[,]" El-Mezain, 664 F.3d at 492 (permitting two witnesses from the Israeli Security Agency to testify using pseudonyms); see also United States v. Urena, 8 F. Supp. 3d 568, 573 (S.D.N.Y. 2014) (the government's interest in protecting an undercover detective's safety and viability as an asset "overwhelmingly outweighs the defendants' interest in public disclosure of his true name"). Finally, because the government has and will continue to comply with its obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, including Giglio v. United States, 405 U.S. 150 (1972), with respect to all of its witnesses, including the UCs, the defendant's case and ability to mount an effective cross-examination will suffer no prejudice.

In like manner, the defendant should be precluded from inquiring into other investigations by the UCs that are unrelated to the defendant because it is not relevant. The use of UCs in counterterrorism matters is essential in providing access to important information to further the government's national security and law enforcement missions. Disclosure of information regarding the UCs' other investigations could disclose certain classified information or provide details regarding other national security investigations that bears no relevance to the UCs' testimony regarding this matter and the defense should be precluded from doing so.

For these reasons, while open public trials serve important democratic values, the potential adverse effects of the limited closure proposed herein are minimal and in no way prejudice the defendant. The requested closure will deprive the public of the opportunity to see – but not to hear – two of the government's law enforcement witnesses, but the defendant will suffer no such deprivation, as he will be able to observe the UCs throughout the UCs'

testimony.  As noted above, the use of a pseudonym rather than the UCs' name will not deprive the defendant of the ability to confront the UCs or to challenge the substance of the UCs' testimony, nor will it deprive the Court or jury of the ability to evaluate the witness's demeanor. Similarly, a light disguise, such as a change in hair color or facial hair, will not deprive the Court or jury in their evaluation of the witness's demeanor while still ensuring the UCs' safety in further national security investigations.  In addition, the government is requesting a live audio feed of the UCs' testimony into another courtroom, allowing the public to listen to the UCs' testimony (which has been standard during the COVID pandemic), and the public will be able to obtain a transcript of the proceeding after the testimony is given.  In light of these measures, there will be no prejudice to the defendant, and the limited deprivation to the public is far outweighed by the government's interest in concealing the UCs' identities.  For these reasons, the proposed protection of the UCs' identities is "no broader than necessary" to protect the UCs' safety and the integrity of ongoing investigations, and the government is unaware of any reasonable alternative that will protect these important interests.

III.    <u>The Court Should Preclude the Defendant From Offering Evidence and Argument Concerning the Defendant's Possible Punishment</u>

The Court should preclude the defendant from referencing at trial any punishment or collateral consequences of his conviction.  If the jury convicted the defendant following trial, it would result in a substantial advisory guidelines range.  Specifically, if convicted, the defendant faces a range of imprisonment of 240 months, the statutory maximum sentence.  While the defendant has not suggested that he intends to introduce any discussion of these facts at trial, out of an abundance of caution, the government moves to

preclude at trial any discussion of the defendant's possible punishment or collateral consequences of conviction.

Evidence regarding possible consequences the defendant may face if convicted should be precluded because it is not relevant.  Pursuant to Rule 401 of the Federal Rules of Evidence, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be would be without the evidence; and (b) the fact is of consequence in determining the action."  Generally, relevant evidence is admissible and "[i]rrelevant evidence is not admissible."  See Fed. R. Evid. 401.  "[T]he district court has broad discretion to exclude evidence that is irrelevant . . . ."  United States v. Edwards, 631 F.2d 1049, 1051 (2d Cir. 1980); see also Fed. R. Evid 403.  The defendant's punishment is not a "fact[] of consequence" to be determined at trial.  Therefore, any evidence related to punishment or collateral consequences is not relevant.  See Shannon v. United States, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task.").

Such evidence is not only irrelevant, but "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion."  Id.  Indeed, jurors are routinely instructed not to consider a defendant's punishment in determining a defendant's guilt.  See generally Sand et al., Modern Federal Jury Instructions, Instruction 9-1 (2017 ed.); see also Shannon, 512 U.S. at 579 (a jury "should be admonished to reach its verdict without regard to what sentence might be imposed [and] not to consider the consequences of their verdicts . . . ." (internal citation omitted)); United States v. Watts, 934 F. Supp. 2d 451, 464-65 (E.D.N.Y. 2013) ("[I]t is well-established precedent that jurors should not be informed about the possible

consequences of their verdict due to the likelihood that prejudice, unfairness, and confusion would result.").

Courts have repeatedly precluded evidence of the potential sentences a defendant faces on the grounds that such evidence is irrelevant, unfairly prejudicial and outside the province of the jury.  See, e.g., United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997) (holding that district court correctly refused to permit defendant to argue about the severity of his possible punishment); United States v. DiMarzo, 80 F.3d 656, 660 (1st Cir. 1996) (district court "soundly excluded" evidence of a potentially harsh sentence because such evidence "would have necessitated an unwarranted departure from the fundamental division of responsibilities between judge and jury."); United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences").  In short, guilt should determine punishment, not the other way around.  See United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court . . . .  We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that the courts may permit it to occur when it is within their authority to prevent.").  Courts have consistently recognized that juries have no right to nullify, and "trial courts have the duty to forestall or prevent such conduct."  Id. at 616.

That the defendant will face a potentially substantial terms of imprisonment if convicted may improperly influence the jury's decision-making.  Therefore, the Court should preclude the defendant from referencing any potential punishment at trial.

IV.    The Defendant's Self-Serving Post-Arrest Statements Should Be Excluded As Hearsay

The government anticipates that the defendant may attempt to cross-examine the government's witnesses in order to elicit the defendant's self-serving, exculpatory statements. The Court should preclude such questioning because such cross-examination does not fall within any of the lawful exceptions to the hearsay rule.

The government's use of statements of the defendant is admissible because, pursuant to Federal Rule of Evidence 801(d)(2), "[a] statement that meets the following conditions is not hearsay: . . . [t]he statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity. . . ." Fed. R. Evid. 801(d)(2)(A).

By contrast, there is no exception allowing a defendant to introduce his own exculpatory statements. Indeed, Federal Rule of Evidence 801(d)(2) does not apply to a defendant. See, e.g., United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); United States v. Black, No. 13 CR 316, 2014 WL 5783067, at *1 (E.D.N.Y. Nov. 5, 2014) (granting government's motion in limine to preclude defendant from eliciting self-serving statements from law enforcement on grounds that "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible"); United States v. Vrancea, No. 13-CR-0316, 2013 WL 549099, at *4 (E.D.N.Y. Jan. 4, 2013) ("Under this rubric, self-serving and exculpatory statements are inadmissible hearsay and may not be introduced by the defendant at trial."); see also, e.g., United States v. Quansah, No. 05-50073-CR, 2006 WL 620755, at *1 (9th Cir. Mar. 6, 2006) ("Self-serving statements are not exempted from the hearsay rule by Federal Rule of Evidence 801(d)(2)(A) or any other exemption or exception, and are thus inadmissible hearsay."); United States v. Wilkerson, 84 F.3d 692, 695 (4th Cir. 1996) (noting that during

direct examination, the government "could have introduced inculpatory statements made by [the defendant]" but also recognizing that the Federal Rules of Evidence "do not provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party").

Under this well settled law, the Court should preclude the defendant from introducing through an opening statement, or eliciting through cross-examination, or otherwise, any of his self-serving, post-arrest statements because they are inadmissible hearsay and are not needed to provide context or a "fair and impartial understanding" of any statement the government may offer. No exception exists for the defendant to admit his self-serving out-of-court statements.

Nor would any of defendant's self-serving and false exculpatory statements serve to clarify or explain any statements which the government intends to offer. Accordingly, if the government does not introduce the self-serving and false exculpatory statements made by the defendant, the defendant should be precluded from introducing—through cross-examination or otherwise—the statements, because they are inadmissible hearsay. The defendant is free to take the stand and testify on his own behalf. He should not, however, be permitted to elicit his false exculpatory statements from other witnesses through inadmissible hearsay.

<u>CONCLUSION</u>

For the reasons set forth above, the Court should grant the government's motions.

Dated: Brooklyn, New York
      January 10, 2022

                Respectfully submitted,

                BREON PEACE
                United States Attorney
                Eastern District of New York

        By:          /s/
                Jonathan E. Algor
                Ellen Sise
                Assistant United States Attorneys
                (718) 254-7000

cc:     Clerk of Court (CBA) (via ECF)
       Samuel Jacobson, Esq. and Nora Hirozawa, Esq., (via ECF and Email)

27