NJM:EHS/LRO/ADR
F. #2019R01179

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                                                            No. 20-CR-135 (CBA)

AWAIS CHUDHARY,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S MOTIONS *IN LIMINE* TO ADMIT CERTAIN EVIDENCE
<u>AND PRECLUDE CERTAIN EVIDENCE AND ARGUMENTS AT TRIAL</u>

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

Ellen H. Sise
Lindsey R. Oken
Andrew D. Reich
Assistant United States Attorneys

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT BACKGROUND ................................................................................................... 2

I.    The Islamic State of Iraq and Al-Sham (ISIS) ............................................................... 2

II.   The Defendant's Consumption of ISIS Media ................................................................ 3

III.  The Defendant's Collaboration with Carpenter .............................................................. 4

IV.   The Defendant's Attempt to Commit a Terrorist Attack for ISIS .................................. 8

V.    The Defendant's Arrest and Charges ............................................................................ 13

VI.   ███████████████████████ ................................................................ 13

VII.  The Defendant's 2022 Guilty Plea ............................................................................... 14

ARGUMENT ............................................................................................................................ 15

I.    Motion to Admit Evidence of Predisposition from the Defendant's Electronic Devices. 15

      A. Legal Standard ......................................................................................................... 15

      B. Application ............................................................................................................... 17

II.   The Court Should Admit Evidence of Carpenter's Conviction ..................................... 20

III.  The Court Should Preclude Evidence or Argument About the Existence or Absence of
      Classified Information as Irrelevant ............................................................................. 20

IV.   The Court Should Preclude Evidence or Argument Inconsistent with Facts Known to
      Defense Counsel, Including from Classified Discovery, and if Necessary, the Court
      Should Admit Certain Prior Statements of the Defendant .............................................. 22

      A. Precluding Inaccurate Evidence and Arguments ...................................................... 23

      B. Admitting Prior Statements ...................................................................................... 24

V.    The Court Should Admit the Defendant's Statements as Party-Opponent Admissions
      When Offered by the Government, and Preclude the Defendant's Statements When
      Offered by the Defendant as Hearsay .......................................................................... 27

VI.   The Court Should Preclude Evidence or Argument Improperly Impugning the
      Government's Investigatory and Prosecutorial Conduct ................................................. 30

i

VII. If the Court Precludes Expert Testimony on the Defendant's Mental Health, it Should Also Preclude Other Evidence or Argument About the Same.......................................... 34

CONCLUSION................................................................................................................... 38

## TABLE OF AUTHORITIES

### CASES

*Dep't of Navy v. Egan*,
   484 U.S. 518 (1988)...................................................................................... 21

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010)........................................................................................... 16

*In re United States*,
   945 F.3d 616 (2d Cir. 2019)........................................................................... 36

*Mathews v. United States*,
   485 U.S. 58 (1988)......................................................................................... 16

*Medoy v. Warnaco Employees' Long Term Disability Ins. Plan*,
   No. 97 CV 6612 (SJ), 2006 WL 355137 (E.D.N.Y. Feb. 15, 2006)........................ 15

*Sacerdote v. N.Y. University*,
   9 F.4th 95 (2d Cir. 2021) .............................................................................. 15

*Shephard v. United States*,
   290 U.S. 96 (1933).......................................................................................... 29

*Shrader v. CSX Transp.*,
   70 F.3d 255 (2d Cir. 1995)............................................................................. 15

*United States v. Agnello*,
   158 F. Supp. 2d 285 (E.D.N.Y. 2001) ........................................................... 37

*United States v. Badia*,
   827 F.2d 1458 (11th Cir. 1987........................................................................ 21

*United States v. Barrow*,
   400 F.3d 109 (2d Cir. 2005)...................................................................... 25, 26

*United States v. Battaglia*,
   No. S9 05 Cr. 774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) .............. 35

*United States v. Blake*,
   195 F. Supp. 3d 605 (S.D.N.Y. 2016)............................................................ 27

*United States v. Cabrera*,
   13 F.4th 140 (2d Cir. 2021) ..................................................................... 16, 19

*United States v. Cardascia*,
   951 F.2d 474 (2d Cir. 1991)........................................................................... 29

i

*United States v. Carpenter*,
　No. 21-CR-38 (KAC) (E.D. Tenn.) ......................................................... 5, 6

*United States v. Cuervelo*,
　949 F.2d 559 (2d Cir. 1991) ................................................................. 33, 34

*United States v. Davidson*,
　308 F. Supp. 2d 461 (S.D.N.Y. 2004) ...................................................... 28

*United States v. Demosthene*,
　334 F. Supp. 2d 378 (S.D.N.Y. 2004) ...................................................... 32

*United States v. Dupree*,
　706 F.3d 131 (2d Cir. 2013) ................................................................. 32, 33

*United States v. Dupree*,
　833 F. Supp. 2d 255 (E.D.N.Y. 2011) ..................................................... 32, 33

*United States v. Farhane*,
　634 F.3d 127 (2d Cir. 2011) ................................................................... 9, 32

*United States v. Funches*,
　135 F.3d 1405 (11th Cir. 1998) ................................................................ 36

*United States v. Gonzalez*,
　399 F. App'x 641 (2d Cir. 2010) ............................................................... 29

*United States v. Gotti*,
　457 F. Supp. 2d 395 (S.D.N.Y. 2006) ...................................................... 29

*United States v. Gotti*,
　641 F. Supp. 283 (E.D.N.Y. 1986) ........................................................... 20

*United States v. Griffin*,
　1996 WL 140073 (S.D.N.Y. 1996) ........................................................... 37

*United States v. Guzman-Loera*,
　No. 09-CR-466 (BMC), 2018 WL 2744701 (E.D.N.Y. June 7, 2018) ................... 32

*United States v. Harper*,
　No. 05-CR-6068L, 2009 WL 140125 (W.D.N.Y. Jan. 20, 2009) .......................... 29

*United States v. Harris*,
　491 F.3d 440 (D.C. Cir. 2007) .................................................................. 35

*United States v. Harwood*,
　998 F.2d 91 (2d Cir. 1993) ...................................................................... 28

*United States v. Hilliard,*
  19-CR-358 (PKC) (E.D.N.Y.) ........................................................ 33

*United States v. Jackson,*
  180 F.3d 55 (2d Cir. 1999)............................................................. 29

*United States v. Johnson,*
  507 F.3d 793 (2d. Cir. 2007)..................................................... 29, 30

*United States v. Knox,*
  687 F. App'x 51 (2d Cir. 2017) ..................................................... 31

*United States v. Lights,*
  No. 15-CR-721, 2016 WL 7098633 (S.D.N.Y. Dec. 5, 2016) ............... 33

*United States v. Lingat,*
  No. 21-CR-573 (MKV), 2024 WL 1051633 (S.D.N.Y. March 11, 2024) ........... 25

*United States v. Lyle,*
  919 F.3d 716 (2d Cir. 2019).......................................................... 25

*United States v. Mahaffy,*
  No. 05-CR-613 (ILG), 2007 WL 1094153 (E.D.N.Y. Apr. 10, 2007) ................ 28

*United States v. Marin,*
  669 F.2d 73 (2d Cir. 1982)............................................................ 27

*United States v. McDaniel,*
  398 F.3d 540 (6th Cir. 2005) ......................................................... 28

*United States v. Miller,*
  641 F. Supp. 2d 161 (E.D.N.Y. 2009) ............................................. 35

*United States v. Muhtorov,*
  20 F.4th 558 (10th Cir. 2021) .......................................................... 9

*United States v. Paccione,*
  949 F.2d 1183 (2d Cir. 1991).......................................................... 35

*United States v. Preldakaj,*
  456 F. App'x 56 (2d Cir. 2012)....................................................... 31

*United States v. Ragano,*
  24-CR-50 (HG) (E.D.N.Y.) .............................................................. 33

*United States v. Reese,*
  933 F. Supp. 2d 579 (S.D.N.Y. 2013)......................................... 32, 36

*United States v. Regan*,
   103 F.3d 1072 (2d Cir. 1997)...............................................................33

*United States v. Roberts*,
   660 F.3d 149 (2d Cir. 2011)................................................................26

*United States v. Rosado*,
   728 F.2d 89 (2d Cir. 1984) .................................................................31

*United States v. Rosemond*,
   841 F.3d 95 (2d Cir. 2016)..................................................................25

*United States v. Saldarriaga*,
   204 F.3d 50 (2d Cir. 2000)..................................................................31

*United States v. St. Rose*,
   No. 11-CR-349 (SJ), 2012 WL 1107659 (E.D.N.Y. Apr. 2, 2012)...................36, 37

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009)..................................................................22

*United States v. Stewart*,
   No. 03-CR-717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004)..................32

*United States v. Velez*,
   354 F.3d 190 (2d Cir. 2004)................................................................25

*United States v. Webb, et al.*,
   No. 15-CR-252 (PKC) .......................................................................32

*United States v. Young*,
   283 F. App'x 858 (2d Cir. 2008) .........................................................32

*United States v. Yousef*,
   327 F.3d 56 (2d Cir. 2003)..................................................................28

*United States v. Yunis*,
   867 F.2d 617 (D.C. Cir. 1989).............................................................22

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
   956 F.2d 1245 (2d Cir. 1992) .............................................................15

## **STATUTES**

18 U.S.C. § 2339B ..................................................................16, 17, 19

18 U.S.C. § 3282 ............................................................................6

18 U.S.C. § 3286(a) ................................................................................................ 6

18 U.S.C. app. 3 .................................................................................................... 21

**<u>RULES</u>**

Fed. R. Evid. 106 .............................................................................................. 29, 30

Fed. R. Evid. 401 ................................................................................... 16, 19, 20, 36

Fed. R. Evid. 402 ................................................................................... 16, 19, 20, 36

Fed. R. Evid. 403 ........................................................................................ 16, 20, 36

Fed. R. Evid. 410(a) ............................................................................................. 24

Fed. R. Evid. 801(d)(2)(A) ................................................................................... 27

Fed. R. Evid. 803(3) ............................................................................................. 28

Fed. R. Evid. 803(8) ............................................................................................. 20

New York Rules of Professional Conduct Rule 3.1(b)(3) ..................................... 23

New York Rules of Professional Conduct Rule 3.3(a) ......................................... 23

New York Rules of Professional Conduct Rule 4.1 .............................................. 23

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in support of its motions *in limine* to:

1. Admit evidence of the defendant's predisposition to materially support the Islamic State of Iraq and al-Sham ("ISIS"), including materials from the defendant's electronic devices, in light of the defendant's assertion of an entrapment defense.

2. Admit evidence that Benjamin Carpenter ("Carpenter"), also known as "Abu Hamza," was convicted for attempting to provide material support to ISIS, and evidence that the defendant coordinated with Carpenter regarding that support.

3. Preclude evidence or argument about the existence or non-existence of specified classified information.

4. Preclude evidence or argument inconsistent with facts known to defense counsel, including facts made known in classified discovery, and if necessary, admit certain prior statements of the defendant.

5. Admit the defendant's statements, including in his March 2024 declaration, as party-opponent admissions and preclude the defendant's statements as hearsay if offered by the defendant.

6. Preclude evidence or argument improperly impugning the government's conduct in this case.

7. Preclude evidence or argument about the defendant's mental health, other than whatever limited evidence the Court may admit as allegedly relevant to the defendant's entrapment defense.

For the reasons set forth herein, the government's motions *in limine* should be granted.

RELEVANT BACKGROUND

I.      The Islamic State of Iraq and Al-Sham (ISIS)

On or about October 15, 2004, the U.S. Secretary of State designated al Qaeda in Iraq ("AQI"), then known as Jam 'at al Tawhid wa' al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity ("SDGT") under Section 1(b) of Executive Order 13224.   On May 15, 2014, the Secretary of State amended the designation of AQI as an SDGT under Section 1(b) to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.   The Secretary of State also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (abbreviated as ISIS, which is how the FTO is referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al-Islamiya, and Al-Furqan Establishment for Media Production.   On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS.   To date, ISIS remains a designated FTO and SDGT.

ISIS members and associates have made public statements and issued public declarations, which, among other things, (i) proclaimed and acknowledged that ISIS had committed acts of violence; (ii) threatened future acts of violence if ISIS's demands were not met; and (iii) were intended to promote and foster the prestige and standing of ISIS.   Since 2013, ISIS supporters have claimed credit for numerous terrorist activities, including multiple attacks against Americans in the United States and against Westerners abroad, and have publicly expressed a desire to continue to target and attack the United States and the West.   To gain supporters, ISIS spreads its messages using social media, Internet platforms, web-based applications, and email. Using these platforms, ISIS posts and circulates videos and updates of events in Syria, Iraq, and elsewhere, in English, Arabic, and other languages, to draw support to its cause.   ISIS has

2

disseminated a wide variety of recruiting materials and propaganda through social media, which include photographs and videos depicting ISIS activities, including beheadings and other atrocities, as well as audio and video lectures by members of ISIS.   ISIS has long counseled followers to commit acts of violence using knives and other crude weapons, and has publicly released videos and other materials that demonstrate how to kill people using knives, explicitly calling for such attacks in the United States.   For example, as relevant here, on January 26, 2015, ISIS leader Muhammad al-Adnani gave an infamous speech, "Die In Your Rage"—a written translation of which was on the defendant's computer by at least July 6, 2018—in which al-Adnani urged followers to attack disbelievers in their own lands, "whether with an explosive device, a bullet, a knife, a car, a rock, or even a boot or a fist."   GX 404.[1]

II.    The Defendant's Consumption of ISIS Media

The defendant possessed and consumed vast quantities of ISIS propaganda, including materials and videos that depicted knife attacks and other graphic violence, as early as April 2018.   As the government learned through searching some of the defendant's electronic devices following his arrest, the defendant possessed all 13 issues of Rumiyah, the online propaganda and recruitment magazine published by ISIS, that were published.   *See* GX 303-315. Metadata associated with the 13 Rumiyah issues indicates that these documents were on the defendant's computer in April 2018.   The second issue of Rumiyah instructed followers, among other things, that attackers should acquire a knife with a "guard," which it describes as a "a protruding piece of metal … to prevent one's hand from sliding forward onto the blade when

---

[1]    GX 404 is a newly marked exhibit.   References to "GX" refer to government trial exhibits.   Copies of all referenced government exhibits are attached hereto and filed under seal due to their violent nature.   The government exhibits that are videos will be provided to the Court electronically.

plunging it into a victim." *See* GX 304 at 13. The fourth issue of Rumiyah likewise encouraged its readers to commit knife attacks, specifically attacks on lone victims for "Prolonged Terror Campaign" or small groups for "Shocking Terror." *See* GX 306.[2]

Dozens of videos of ISIS propaganda were found on the defendant's laptop, showing his avid consumption of violent ISIS content. The defendant also possessed a written copy of Sheikh Adnani's infamous "Die In Your Rage" speech, in which al-Adnani urged followers, including Americans, to conduct attacks wherever they were, including through use of knives. *See* GX 404. Metadata from the defendant's computer reflects that he possessed a written copy of the speech since July 6, 2018, and last accessed it on August 16, 2019.

The defendant also possessed a Samsung phone (the "Samsung Device") that contained dozens of audio recordings of Anwar al-Awlaki, an al Qaeda leader who was widely regarded as the leading figure inciting English-speaking Muslims to participate in violent jihad (even in 2019, which was approximately eight years after Awlaki's death). The Samsung Device also stored dozens of images of ISIS propaganda including several depicting ISIS flags and ISIS fighters, some of whom are holding machine guns and others of whom are holding knives. *See, e.g.*, GX 612, 613, 614, 617, 621, 628, and 629. The defendant also had an Apple iPhone (the "iPhone"), which included a note about martyrdom, *i.e.*, dying for religious beliefs, from early July 2019. GX 1107.

III.    The Defendant's Collaboration with Carpenter

In addition to collecting and consuming ISIS propaganda, the defendant edited and propagated it. Evidence obtained through a judicially authorized search of the defendant's HTC

---

[2]    The defendant sent an image from this article to an online covert employee ("OCE") more than a year after the article was downloaded to the defendant's computer. *Compare* GX 306 at 8 *with* GX 202 at CHUDHARY000113-14 (the relevant excerpt of GX 202 is enclosed).

cell phone (the "HTC Device") establishes that the defendant helped Benjamin Carpenter to edit ISIS propaganda.[3]   Carpenter—who went by the handle "Abu Hamza"—was later convicted of attempting to provide material support to ISIS and sentenced to 20 years' imprisonment for his role in translating ISIS propaganda.   *See United States v. Carpenter*, No. 21-CR-38 (KAC) (E.D. Tenn.); *see generally id.* ECF No. 224 (summarizing Carpenter's role as a translator for ISIS's Al Hayat Media Center).   In connection with earlier litigation in this case, the defendant swore that he began communicating with Carpenter in September 2018, and the defendant's communications with Carpenter on the HTC Device date back to at least as early as February 2019.   A declaration submitted by the defendant in support of a prior motion to dismiss, *see* ECF No. 177 (enclosed as Exhibit A), indicates that:

> A user named Abu Hamza had posted something online.   He seemed very knowledgeable about Islam. . .   I had to get his attention and get his help.   I asked him a question [.] . . .   I sent him more questions I had about Islam and interpretations of different texts and he responded[.] . . .   Abu Hamza finally responded and invited me to chat on Telegram.   He also invited me to a group chat.   On or about the last week of September 2018, Abu Hamza introduced me on Telegram to two users I now know to be undercovers and said they were "two pious, knowledgeable brothers that can help you with your questions akhi" or something similar.

---

[3]     Pursuant to the Court's May 2, 2025 order, the government hereby advises the Court and the defendant that it intends to introduce evidence at trial from the HTC Device, which was discovered during the government's review of the HTC Device pursuant to the search warrant authorized by the Court on April 22, 2025.   Consistent with the government's prior representations, there were no applications to search the HTC Device prior to July 2024.   Prior to the defendant's arrest, the government applied for a warrant to search the defendant's residence, including for all electronic devices in the defendant's residence.   The Honorable James Orenstein, then-United States Magistrate Judge, Eastern District of New York, ultimately signed a warrant authorizing the seizure of one electronic device (an Acer laptop).   Subsequently, during the search of the defendant's residence, the FBI interviewed the defendant's mother, who stated that the defendant "used a black and white HTC phone."   CHUDHARY000852.   The HTC Device was thereafter seized from the defendant's bedroom.

Ex. A. ¶ 12.   As the complete factual record in this case reflects, the defendant was mistaken that, in 2018, Carpenter—or "Abu Hamza"—introduced the defendant to "undercovers."   *See* Court's July 23, 2024 Classified Mem. & Order.   Nevertheless, the defendant's declaration reflects several key admissions: the defendant concedes that he proactively, on multiple occasions, reached out to Carpenter, who was later convicted of working on behalf of ISIS during that time; and the defendant admits that he was first brought into a Telegram group chat by Carpenter.   Because both of these actions predated any FBI communications with the defendant, both are relevant to establishing the defendant's predisposition to materially support ISIS.

As reflected in communications recovered from the defendant's HTC Device, between February 2019 until August 27, 2019—two days before the defendant's arrest—the defendant and Carpenter exchanged hundreds of messages (enclosed as Exhibit B).   The messages reflect that the defendant conspired with Carpenter to provide material support to ISIS by translating ISIS propaganda material—an entirely different theory of criminal liability, for which the defendant could be separately charged with providing or attempting to provide material support to ISIS.[4]   Specifically, Carpenter was convicted at trial for attempting to provide material support to ISIS for publishing a large body of ISIS media, including his weekly newsletter entitled *From Dabiq to Rome* ("*DTR*"), a periodical that, among other pro-ISIS propaganda themes, celebrated the deaths of American soldiers, glorified suicide bombers, and called for open war against the United States and its Western allies.   *United States v. Carpenter*, No. 21-CR-38 (KAC) (E.D. Tenn.), ECF No. 224, at 8, 12-13.   Telegram messages between Carpenter and the defendant show that the defendant proofread and edited ISIS propaganda propagated by Carpenter, including *DTR*.

---

[4]    The statute of limitations for 18 U.S.C. § 2339B is eight years.   18 U.S.C. §§ 3286(a), 3282.

The below is an illustrative example of Carpenter requesting that the defendant edit *DTR*, and the defendant agreeing and providing edits.   On or about March 9, 2019, the following exchange occurred in one-on-one messages between the defendant and Carpenter.

| Carpenter: | are you available now to proof read [sic] the newsletter? |
|---|---|
| Carpenter: | need you to read it and check for grammatical errors and spelling mistakes |
| Chudhary: | Alhamdulullahir Rabbil 'Alamin[5] yes |
| Carpenter: | ok stay there |
| Carpenter: | sending |
| Carpenter: | [sends File Name: From Dabiq To Rome #53.pdf] |
| Chudhary: | How should I inform if there are mistakes? |
| Carpenter: | Should take you about 20 minutes maybe |
| Carpenter: | Screenshot |
| Carpenter: | Okay inshaAllah |

                              ***

| Carpenter: | everything ok? |
|---|---|
| Chudhary: | Yes, alhamdulillah still checking and placing screenshots in word doc inshaAllah |

                              ***

| Carpenter: | Will release soon in sha Allah |
|---|---|
| Chudhary: | I would not do that if I were you here are the fixtures alhamdulillah, please forgive me as it is difficult at times with thr [sic] screenshots, please pull that release down and here are the fixtures |
| Chudhary: | [sends File name: 53 Fixtures.docx] |

A document recovered from the defendant's laptop, titled in the same name, "53 Fixtures.docx" (enclosed as Exhibit C), ostensibly reflects edits the defendant made to Issue 53 of *DTR*.   The metadata associated with Exhibit C indicates that the defendant is the author, and that it was created on March 9, 2019, edited for 1 hour 37 minutes, and last saved by the defendant.   The document from the defendant's laptop indicates that the issue discussed, among other things, ISIS soldiers

---

[5]       This translates roughly to "All praise is due to God, Lord of all the worlds."

killing 30 people.   This was only one example of the more than at least half dozen times the defendant provided edits to Carpenter's ISIS propaganda.

IV.    The Defendant's Attempt to Commit a Terrorist Attack for ISIS

On August 23, 2019, in response to a posting by an FBI-controlled account, the defendant began communicating with two OCEs (these two individuals are referenced in discovery as "UC-1" and "UC-2") based on the defendant's desire and plan to conduct a knife and/or bomb attack in Queens, New York, on behalf of ISIS.   Throughout his communications with UC-1 and UC-2, the defendant repeatedly expressed his support for ISIS and stated that he wanted to conduct a knife or bomb attack in locations such as the pedestrian bridges over the Grand Central Parkway to the Flushing Bay Promenade (the "Promenade") and the New York World's Fair marina located in the Promenade, and to record his attack in order to inspire others to perform similar attacks.

Specifically, on or about August 23, 2019, the FBI-controlled account posted a message that read:

> Everyone want to become LONE MUJAHID contact Only for Lone Wolves We Don't Need Followers We are munasireen of Dawlatul Islamiyah.  Baqiyah wa Tatamaddad Send us a message and we will respond to it soon insha'Allah.

On or about August 23, 2019, at approximately 11:21 a.m., the defendant responded.   The defendant's initial response read:

> Please give me information, preferably video showing the proper knife with its name (because I can't find the name of it after seeing it), and more information for asbaab such as how to not leave traces of finger prints, DNA, etc. as I'm in the west.  I ask Allah to give us the blessing to carry this out and to blinden the mushrikeen and not let us get caught or imprisoned, for indeed the entire plot belongs to Allah alone.  I ask Allah to make our hearts firm and not make us ever those who doubted and therefore disbelieved.  Here it is below but I don't know much technique at all nor the name of the knife and I don't know where to get it really.

8

In response, approximately 35 minutes later, UC-1 asked whether the defendant intended to commit a knife attack and how soon he planned to commit it. The defendant responded 20 minutes later:

> Yes knife because that's what I know; but if you think you can help me on how to build a bucket bomb, etc. also then that's also something I was thinking but I don't know how or any other light weight explosive. As for when, then soon, insha'Allah. But again, I need to know how and the best way to make it swift with no traces left behind, insha'Allah. As for targets, there's a more quiet and darker area that's near a wide river where people pass and before that, there's also a mini bridge over a busy road with many cars under which is why I mentioned the bucket bomb.

In sum and substance, these communications demonstrate that the defendant had identified, on his own, where he wanted to commit his attack and that he was considering a knife or a bomb attack.

On the same day, at 2:37 p.m., UC-1 asked the defendant "you swear bay'ah yet[?]" "Bay'ah," also known as "bayat," is a ritual in which a person pledges an oath of allegiance, and has been known to be a method of demonstrating support to foreign terrorist organizations such as ISIS and al-Qaeda. *See, e.g.*, *United States v. Farhane*, 634 F.3d 127, 133 (2d Cir. 2011) (defendant's pledge of "bayat" constituted evidence to support conviction for providing material support to al Qaeda); *United States v. Muhtorov*, 20 F.4th 558 (10th Cir. 2021) (describing how defendant "swore his 'Bay'ah,' or allegiance, to the [Islamic Jihad Union]"). The defendant did not ask for clarification about the term or otherwise express confusion. Instead, less than 30 minutes later, the defendant told UC-1 that he had "given ba'yah to Ameer al-Mu'mineen"—a reference to Abu Bakr al-Baghdadi, the leader of ISIS from 2014 until his death in 2019. UC-1 responded, "you given bay'ah in the silence of your heart or in public? We have many people contact us who are not serious and play games have no time for games." The defendant responded: "On the tongue and by myself Alhamdalillah and that includes the heart."

9

On the same day, at 4:41 p.m., UC-1 stated, "akhi to know what kind of bomb need to see pictures of operations areas and to know you serious to do this for Dawlah.  you can take pictures and send?"  At 5:09 p.m., the defendant responded, "Even better insha'Allah, I made videos."  Five minutes later the defendant wrote,

> The above is the video of bridge and yes I did this about *an hour ago*.  I was thinking about simply throwing bucket bomb or several light weight bombs at the cars over the fencing but the problem is I do not know how to make them.  However if none of these asbaab are in our capability then the knife but i do not know its name by brother.  (Emphasis added.)

In other words, the defendant's communications show that—even before UC-1 asked for pictures—the defendant took videos of the places at which he wanted to commit a terrorist attack on behalf of ISIS.  The defendant told UC-1 that the videos depicted the bridge he mentioned earlier and that he was thinking about using "bucket bombs or several light weight bombs" for the attack.  The defendant also told UC-1 that he would send a different video depicting the "knife area" where he intended to conduct an attack, but the video files were too large because he had recorded them with his cellphone.  Because UC-1 was not receiving the reconnaissance and targeting videos showing where the defendant wanted to commit his attack, UC-1 directed the defendant to send the videos to an account controlled by UC-2.

The defendant then sent multiple videos of his proposed attack locations to UC-2, including video files that depicted a bridge, and other videos entitled "First Portion after bridge" and "Third Portion after bridge."  The videos show the pedestrian bridges over the Grand Central Parkway to the Promenade in Queens.  The defendant also sent UC-2 two screenshots of a video depicting a bomb attack.  The full video was found on the defendant's computer.  *See* GX 346.  After sending the first screenshot, the defendant wrote of the bomb depicted in the video: "This is what I mean by bucket bomb or something hefty as you see he placed it and then moved away for

its hefty explosion for the grace of Allah."   The defendant then sent the second screenshot and stated: "And this is what I mean by a light weight easy to carry explosive."   A review of the screenshots sent by the defendant shows that the video featured a graphic of an ISIS flag in the upper left-hand corner.

On the same day, in addition to sending UC-2 the videos of locations where he wanted to commit a terrorist attack, the defendant also sent materials reflecting his plans for a knife attack.   The defendant sent UC-2 a screenshot of a document with the words "Islamic Stat[e]" at the top and the subheadings "Places to Strike," "The Ideal Knife," and "Knives to Avoid."   The document the defendant sent also included a diagram of the human body depicting where to stab victims.   GX 202 at CHUDHARY000113-14.   As discussed above, the screenshot was from Rumiyah, the online ISIS propaganda magazine, and specifically from the same issue of Rumiyah found on the defendant's laptop.   *See* GX 306 at 8.

The defendant continued to detail his plans to UC-1.   The defendant told UC-1 that he selected his proposed attack locations because they have "easier escape routes" and "more room for [his] scooter."   The defendant thereafter explained his timeline for procuring supplies to conduct an attack and noted that he wanted to start with a knife because buying materials for explosives "bring suspicion by the crusaders and their miserable worshippers."   He also stated that he had searched an online retailer's ("Online Retailer-1") website for the knife he wanted to use in his attack but could not find the "proper knife" and asked UC-1 for suggestions and whether the defendant needed gloves and a mask.

The next day, on or about August 24, 2019, after UC-1 sent the defendant a photograph of a knife as a possible purchase (which was similar to the Rumiyah knife depicted in the picture the defendant sent to UC-2), the defendant responded that "buying a knife like this

11

draws attention." The defendant also sought guidance on the use of "medical latex gloves" during an attack and whether they would "not leave finger prints and DNA." He also asked for training videos to show "how to effectively use [a] knife and training in general . . . as training for Jihad for Allah is worship in itself." Also on or about August 24, 2019, UC-1 asked the defendant to take additional videos of his targeted location when it was its most crowded. That same day, law enforcement officers conducted surveillance of the defendant and observed him exit his residence in Queens and proceed on foot to the area in and around the Promenade. The surveilling agents observed the defendant enter the Promenade and take videos and photographs of the area with a cellphone, sometimes in a surreptitious manner by holding the cellphone close to his chest. The surveilling agents also observed the defendant taking videos and/or photographs of, among other locations, parts of the Promenade, the World's Fair marina, a security gate leading to the marina, a gas station and donut shop located in or around the Promenade, and a security camera located in the vicinity of the donut shop.

The defendant's communications with the OCEs continued in subsequent days, during which the defendant took further steps in his plan to conduct an attack on behalf of ISIS. On or about August 25, 2019, the defendant explained plans for how he might escape after the attack. Specifically, the defendant told the UC that he considered committing the attack "near one of the Masjids and then enter the Masjid for changing clothes," where there was "a lot of darkness" and he could "wait therein if their police forces or army – woe to them – come, as they do after an attack by the Khilafah," and to leave his backpack and scooter to retrieve them later.

That same day, the defendant and UC-1 discussed purchasing through the Online Retailer-1 website different items for the attack, including, among other things, several knives, a strap for the defendant's cellphone (to allow the defendant to record his attack), gloves, a mask,

and tactical clothing.    UC-1 thereafter provided the defendant with an Online Retailer-1 account, preloaded the account with money and, consistent with the defendant's requests, placed the following items in the shopping cart: (a) an 11-inch black "Fixed Blade Tactical Knife"; (b) a nine-inch high carbon "Fixed Blade Knife"; (c) a two-piece "Tactical Combat Survival Hunting & Neck Knives"; (d) a cellphone chest and head strap; (e) a polo shirt; (f) tactical lightweight assault cargo pants; (g) a black face mask; and (h) a pair of "covert Tactical" gloves.    In response, the defendant sent UC-1 two screenshots of two knives and informed UC-1 that he was "having difficulty choosing between them."

Later that day, the defendant sent UC-1 a screenshot indicating that he had ordered a "420 High Carbon Stainless Steel Fixed Blade Survival Tactical Knife," but the defendant eventually canceled that order because he wanted to have it delivered more quickly.

V.    The Defendant's Arrest and Charges

On August 29, 2019, law enforcement officers observed the defendant depart his residence and travel to the Shops at Skyview Center in Queens.    Law enforcement officers further observed the defendant approach an Online Retailer-1 locker.    The defendant was arrested as he attempted to open the locker.    At the time of his arrest, the defendant was in possession of two cellular devices, the Samsung Device and the iPhone.    The defendant gave consent to search both devices.    In addition, the government obtained a search warrant for the defendant's laptop computer and, in 2025, obtained a warrant to search a third phone, the HTC Device.

VI.    ███████████████

███████████████████████

███████████████████████

███████████████████████

███████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████    ████████████████████████

██████████████████████████████████████████

████████████████████████████

VII.    The Defendant's 2022 Guilty Plea

On August 26, 2022, the defendant pleaded guilty to the sole count of the Indictment before the Honorable Robert M. Levy, United States Magistrate Judge, Eastern District of New York.   During his allocution, the defendant, through his attorney, admitted, among other things, that he communicated with undercover agents regarding "his desire to provide support to ISIS" while knowing that "ISIS was a designated terrorist organization."  *See* Aug. 26, 2022 Transcript at 19-24.   The defendant further agreed that, when he "initially started to communicate with what he believed to be a pro-ISIS supporter account, that [the defendant] said he wanted to commit a knife attack in Queens, and then subsequently sent surveillance videos following that." *Id.* at 24.

On March 21, 2025, the Court granted the defendant's motion to withdraw his guilty plea.

ARGUMENT

I.    Motion to Admit Evidence of Predisposition from the Defendant's Electronic Devices

Before the defendant's scheduled 2022 trial, the Court precluded the government from introducing certain exhibits on the basis that they were cumulative or inflammatory. *See* Aug. 17, 2022 Tr. at 8-46.    In light of the changed circumstances—specifically, that the defendant now intends to argue that he was entrapped because FBI-controlled accounts posted ISIS propaganda to group chats in which he was a member—the government moves the Court to reconsider its prior ruling, and to admit certain exhibits previously precluded.[6]

A.    Legal Standard

The grounds justifying reconsideration are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). Reconsideration should never be granted lightly, because "[t]he standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995); *see also Sacerdote v. N.Y. University*, 9 F.4th 95, 118 n.94 (2d Cir. 2021) (same); *Medoy v. Warnaco Employees' Long Term Disability Ins. Plan*, No. 97 CV 6612 (SJ), 2006 WL 355137, at *1 (E.D.N.Y. Feb. 15, 2006)  ("The standard . . . is strict

---

[6]    The government also intends to mark new exhibits, including but not limited to: (1) Telegram communications between the defendant and Carpenter; (2) the Die In Your Rage speech from the defendant's computer (GX 404); (3) a video from the defendant's computer in which he recorded his Acer Laptop home screen to show how he collected ISIS propaganda, and showing others how to use operational security to avoid detection from the law enforcement, and which he posted to the Die In Your Rage Telegram group chat; and (4) the Microsoft Word document reflecting his edits to *DTR*, which he sent to Carpenter.

in order to dissuade repetitive arguments on issues that have already been considered fully by the Court.").

Title 18, United States Code, Section 2339B criminalizes "knowingly provid[ing] material support or resources to a foreign terrorist organization, or attempt[ing] or conspir[ing] to do so." Among the elements that the government must provide beyond a reasonable doubt is the defendant's knowledge of the foreign group's designation as a foreign terrorist organization or its commission of terrorist acts. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 130 (2010).

In assessing whether evidence is admissible at trial, courts must consider if the evidence is relevant, meaning that it has a tendency to make a fact more or less probable, and that fact is of consequence to the action. *See* Fed. R. Evid. 401, 402. The court may exclude relevant and otherwise admissible evidence only where its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, or because it is cumulative. Fed R. Evid. 403.

"[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (citations omitted). Inducement happens when the government has "initiated the crime." *United States v. Cabrera*, 13 F.4th 140, 146 (2d Cir. 2021) (internal quotation marks and citation omitted). "Inducement covers soliciting, proposing, initiating, broaching or suggesting the commission of the offence charged." *Id.* (internal quotation marks and citation omitted). "[W]hen a defendant has presented credible evidence of inducement by a government agent, the government has the burden of proving beyond a reasonable doubt that the defendant was predisposed to commit the crime." *Id.* (internal quotation marks and citation omitted).

B.    <u>Application</u>

In arguing entrapment, the defendant is putting his predisposition directly at issue. As such, the government should be permitted substantial latitude in introducing evidence to prove that the defendant was predisposed to support ISIS, including by showing the jury the pre-existing ISIS propaganda on the defendant's electronic devices.   Indeed, the government has already whittled down the vast amount of ISIS propaganda from the defendant's electronic devices to a few dozen exhibits.   As described above, the government seized four electronic devices from the defendant and/or his residence: an Acer laptop (the "Acer Laptop"), the iPhone, the Samsung Device, and the HTC Device.   As further described below, the Acer Laptop, iPhone, Samsung Device, and HTC Device contained relevant evidence of the defendant's attempted material support of a foreign terrorist organization, in violation of 18 U.S.C. § 2339B.   Previously, the Court precluded certain of the government's exhibits on the basis that they were cumulative or inflammatory.   *See* Aug. 17, 2022 Tr. at 8-46.   However, at the time of that ruling three years ago, it was not clear that the defendant intended to rely heavily (if not exclusively) on an entrapment defense.   Given that the defendant has now stated his intention to argue that he was entrapped by the FBI, and to support that argument with evidence that the FBI shared ISIS propaganda, evidence of the troves of violent ISIS propaganda on the defendant's electronic devices that did *not* come from the FBI is critical to establishing the defendant's ISIS leanings, independent of any alleged FBI inducement.

In 2022, months in advance of trial, the government provided the defendant with its proposed exhibit list, including its list of exhibits which were found on the defendant's electronic devices.   *See* ECF No. 88.   Pursuant to the Court's order, and following a meet and confer with defense in which the government explained the relevance of each contested exhibit, the government culled its list of exhibits from the defendant's devices down to 55 exhibits from

17

the Acer Laptop, one exhibit from the defendant's iCloud, 22 exhibits from the Samsung Device, and 19 exhibits from the iPhone.   These exhibits reflect, among other things: (1) ISIS propaganda materials; (2) videos and images that the defendant sent to OCEs; (3) relevant Google search history and location information; and (4) the passcode for the Amazon locker where the defendant was arrested while attempting to pick up the equipment that he ordered to use in his planned terrorist attack.   In sum, the Court precluded the following evidence:

- Rumiyah issues in their entirety (GX 303-315).

- "Constants on a Path to Jihad" in its entirety (GX 302).

- Exhibits reflecting the ISIS flag except for one ISIS flag from each of the defendant's devices.

- Defendant's Google search "islamqa dying in fire" made on the day he was arrested trying to pick up a knife and other tactical gear (GX 1085).

- Defendant's Google search "If a person dies by burning is he regarded as a martyr?   Islam Question & Answer" made on the day he was arrested trying to pick up a knife and other tactical gear (GX 1115).

- Portions of ISIS propaganda titled "The SWORD is a Must Jihad is a MUST" (GX 317).

- Screenshot of a video depicting Bin-Laden with an ISIS Flag (GX 342.1).

- Video of a bomb going off, screenshots of which the defendant sent UC-2 (GX 346).

- ISIS propaganda showing a truck exploding (GX 347.1).

- Video of ISIS training, including demonstrating committing an attack with a knife (GXs 349.1 and 349.2).

- Video of ISIS terrorists lining up hostages and preparing to behead them, titled "Islamic State – Even Though The Infidels Dislike It" (GX 364.1).

- Video of the defendant's laptop showing he had folders labeled "IS," "IS screenshots," and "Islamic State" (GX 401).

In the first instance, the ISIS propaganda files found on the defendant's devices are highly relevant to his knowledge that ISIS was a foreign terrorist organization, an element that the government must prove at trial.  *See* Fed. R. Evid. 401, 402; 18 U.S.C. § 2339B(a)(1).  But now, there is a second, independent reason these exhibits are relevant: each of these exhibits demonstrates the defendant's predisposition to materially support ISIS.  Given that the defendant intends to argue he was entrapped, the government will be required to prove beyond a reasonable doubt the defendant's predisposition.  *See Cabrera*, 13 F.4th at 146.  In making a factual determination as to whether the defendant was predisposed to materially support ISIS, the jury must be able to see the violent propaganda in which the defendant steeped himself, and to understand the volume of material that he amassed.  These exhibits are not prejudicial because they are not more inflammatory than the charged conduct—and moreover, the more inflammatory they are, the more probative they are of the defendant's callous embrace of a violent terrorist organization, even in the face of his awareness of the abject horrors it perpetrated.  In other words, the sensational nature of the materials the defendant downloaded is directly relevant to the question that will confront the jury on an entrapment theory, and enhances its probative value.  (This is particularly so because the defendant has repeatedly asserted, and apparently intends to argue to the jury, that engaging with ISIS propaganda is somehow not violent and does not demonstrate a predisposition to commit violence on behalf of ISIS.)  Moreover, the defendant is charged with attempting to commit a violent knife or "bucket bomb" attack on behalf of ISIS—none of these exhibits is more violent than the defendant's planned attack.  As such, the exhibits the Court previously precluded, (1) portions of GX 302-315, 317; (2) 342.1, 346, 347.1, 349.1, 349.2, 364.1, 401, 1085, and 1115 in their entirety; and (3) all ISIS flags except for one ISIS flag from each of the defendant's devices, should now be admitted.

19

II.    <u>The Court Should Admit Evidence of Carpenter's Conviction</u>

As described above, in assessing whether evidence is admissible at trial, courts must consider if the evidence is relevant, meaning that it has a tendency to make a fact more or less probable, and that that fact is of consequence to the action.  *See* Fed. R. Evid. 401, 402.   The Court may exclude relevant and otherwise admissible evidence only where its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, or because it is cumulative.  *See* Fed R. Evid. 403.

As shown above, Carpenter and the defendant conspired to create and disseminate violent ISIS propaganda.   The defendant previously admitted that he spoke to Carpenter before speaking to any FBI-controlled accounts.  As such, Carpenter's conviction for attempting to provide material support is plainly relevant to overcoming an entrapment defense by proving that the defendant was predisposed to commit the instant crime of attempting to provide material support.   Indeed, having already committed the crime of material support of ISIS through his work with Carpenter firmly establishes the defendant's predisposition to commit the same crime again a year later.    In addition, the judgment of conviction is subject to a hearsay exception under Federal Rule of Evidence 803(8). *See United States v. Gotti*, 641 F. Supp. 283, 291 (E.D.N.Y. 1986) (admitting guilty plea under public records hearsay exception).   Accordingly, the Court should admit evidence of Carpenter's conviction.

III.    <u>The Court Should Preclude Evidence or Argument About the Existence or Absence of Classified Information as Irrelevant</u>

The defendant noticed certain classified information pursuant to the Classified Information Procedures Act ("CIPA"), which provides the procedural framework for handling classified information in criminal cases, and the Court ruled on that notice.  *See* ECF No. 247. Out of an abundance of caution, the government moves to preclude any inquiry or argument about

classified information during trial outside the scope of CIPA. *See, e.g., United States v. Badia*, 827 F.2d 1458, 1464–66 (11th Cir. 1987) (precluding inquiry for failure to provide notice under CIPA Section 5). Publicly disclosing the existence or absence of particular classified information, even in general terms, would tend to reveal classified facts and thus risk damage to national security. Additionally, any testimony or argument about the general absence or existence of classified information would be irrelevant and inadmissible.

CIPA Section 5 requires a defendant to provide notice of his or her intent to seek to disclose classified information at trial. 18 U.S.C. app. 3 § 5. CIPA Section 6 prescribes a hearing for the Court to make pretrial determinations about the use, relevance, and admissibility of that classified information at trial. 18 U.S.C. app. 3 § 6. Finally, CIPA Section 8 addresses limited circumstances not covered by Sections 5 and 6, like when defense counsel inadvertently asks a question calling for classified information, and permits the government to object to any inquiries that might require a witness to disclose classified information not previously held to be admissible.[7] 18 U.S.C. app. 3 § 8(c).

The Supreme Court has "recognized the Government's 'compelling interest' in withholding national security information from unauthorized persons in the course of executive business" and described the reasons underlying that interest as "too obvious to call for enlarged discussion." *Dep't of Navy v. Egan*, 484 U.S. 518, 527, 529 (1988) (citations omitted). This interest applies both to disclosing information as well as to confirming or denying the existence of such information, which could harm intelligence sources, methods, and operations by revealing

---

[7] CIPA Section 7 permits the government to take an expedited interlocutory appeal if the district court: (1) authorizes the disclosure of classified information; (2) imposes sanctions for nondisclosure of classified information; or (3) refuses to issue a protective order sought by the government to prevent the disclosure of classified information. 18 U.S.C. app. 3 § 7.

the scope of the government's ability to collect information (or lack thereof).   As the D.C. Circuit has explained, "much of the government's security interest in the conversation lies not so much in the contents of the conversations, as in the time, place, and nature of the government's ability to intercept the conversations at all."   *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989). The Second Circuit has adopted *Yunis*'s reasoning, and made clear that disclosing whether the U.S. intelligence community obtained information about any particular person would reveal national security and classified information.   *See United States v. Stewart*, 590 F.3d 93, 131–32 (2d Cir. 2009) (holding that the details of the NSA's operations, including "the surveillance vel non of any particular group," implicate national security).   General questions or arguments about the existence or non-existence of classified information are irrelevant and inadmissible and should also be precluded.   Testimony confirming the existence of classified documents (if any did exist) after the Court ordered that any such documents could be withheld under CIPA Section 4 could cause the jury to speculate about the nature of any such document and could damage national security by revealing intelligence sources and methods.   *See Yunis*, 867 F.2d at 623.   Testimony confirming that no such documents exist (if that were so) is likewise inadmissible, and could theoretically expose gaps in U.S. national security efforts or capabilities that could be exploited by hostile actors.   Any inquiry or argument about classified information at trial should thus be precluded.

IV.    The Court Should Preclude Evidence or Argument Inconsistent with Facts Known to Defense Counsel, Including from Classified Discovery, and if Necessary, the Court Should Admit Certain Prior Statements of the Defendant

The government respectfully moves to preclude the defendant from offering evidence or advancing arguments that are inconsistent with his prior statements or are otherwise factually inaccurate, including based on classified discovery.   Relatedly, should the defendant testify, or offer evidence or arguments at trial that conflict with the defendant's prior statements,

the government hereby notifies the Court and the defendant that it intends to introduce at trial—through cross-examination and/or through witness testimony, in the government's case-in-chief or its rebuttal case—prior statements made by the defendant, including during his June 2021 meeting with the government.

### A.    Precluding Inaccurate Evidence and Arguments

As an initial matter, the defendant should be precluded from introducing evidence or making arguments that are inconsistent with the factual record, including based on the defendant's own prior statements as well as information known to defense counsel through classified discovery.   The New York Rules of Professional Conduct prohibit attorneys from asserting a defense unless "there is a basis in law and fact for doing so that is not frivolous."   *See* Rule 3.1 (governing "Non-Meritorious Claims and Contentions").   A lawyer therefore may not "knowingly assert material factual statements that are false."   *Id.* at Rule 3.1(b)(3).   Similarly, the Rules prohibit attorneys from "knowingly mak[ing] a false statement of fact" in the course of representing a client, or from "offer[ing] or us[ing] evidence that the lawyer knows to be false." *See id.* at Rule 3.3(a), Rule 4.1.

Here, the defendant has previously made a number of inculpatory statements—including during his ███████████, his August 2022 guilty plea, and his January 2023 statements to Dr. Mary Riggs Cohen.   In connection with his various prior statements—some of which were made under oath or in the presence of federal law enforcement officers—the defendant conceded, among other things, that he gradually became immersed in ISIS; that he communicated with one or more accounts that he believed to be controlled by pro-ISIS supporters; that he planned to commit a knife attack in Queens, New York; and that, at the time he did so, he knew that ISIS was a designated terrorist organization.   *See, e.g.*, Aug. 26, 2022 Transcript at 19-24 (admissions that the defendant communicated with undercover agents regarding "his desire to provide support

23

to ISIS" while knowing that "ISIS was a designated terrorist organization" and that, when he "initially started to communicate with what he believed to be a pro-ISIS supporter account, that [the defendant] said he wanted to commit a knife attack in Queens, and then subsequently sent surveillance videos following that"); ECF No. 238 (Cohen Report) (statements by the defendant that "his immersion in ISIS was a slow process and that he was influenced by 'scholars and eloquent people'").   Moreover, as this Court is aware, certain information was produced to cleared defense counsel in classified discovery.   The defendant should therefore be precluded from testifying or asserting arguments that are inconsistent with his prior statements or are otherwise factually inaccurate—including any argument that he was purportedly radicalized by the FBI or the government, that he did not otherwise communicate with pro-ISIS accounts, or that he did not know that ISIS was a designated terrorist organization.   Out of an abundance of caution, the government seeks a ruling that the defendant cannot present evidence or argument that defense counsel knows to be false.

### B.    Admitting Prior Statements

Additionally, should the defendant testify or offer evidence or arguments at trial that conflict with the defendant's prior statements, the government hereby notifies the Court and the defendant that it intends to introduce at trial—through cross-examination and/or through witness testimony, in the government's case-in-chief or its rebuttal case—prior statements made by the defendant, including during ███████████████████████████.

24

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████

Accordingly, should the defendant testify or offer evidence or arguments at trial that conflict with his prior statements—including those made during ██████████—the government respectfully submits that it should be permitted to offer evidence of those statements through cross-examination or witness testimony during its case-in-chief or rebuttal case.

V.    The Court Should Admit the Defendant's Statements as Party-Opponent Admissions When Offered by the Government, and Preclude the Defendant's Statements When Offered by the Defendant as Hearsay

At trial, the government intends to introduce various statements made by the defendant, both before and after his arrest in the instant case.[8]   The government therefore respectfully moves to admit prior statements of the defendant where those statements are offered at trial by the government, and to preclude any additional prior statements if offered by the defendant.

The government generally may introduce a defendant's statements into evidence because a statement is not hearsay if it is "offered against an opposing party and . . . was made by the party in an individual or representative capacity."   Fed. R. Evid. 801(d)(2)(A).   These statements are well-within the purview of Rule 801(d)(2)(A) and thus are admissible.

The Court should preclude the defendant from admitting other portions of his statements, either on cross-examination or in his case-in-chief, because such testimony would constitute hearsay without any exception.   A defendant generally is prohibited from introducing his own out-of-court statements at trial.   *See United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); *United States v. Blake*, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) (quoting same).   Therefore, a "court may . . . exclude any portion that consists largely of a defendant's own self-serving statements, which, as offered by him, are inadmissible

---

[8]    Many of the defendant's statements that the government intends to offer at trial—including statements made by the defendant in Telegram chatrooms and materials recovered from the defendant's electronic devices—were the subject of prior litigation and previously deemed admissible by the Court.   The government intends to offer those statements previously identified, as well as others, including certain portions of the defendant's March 2024 declaration (Exhibit A) and the defendant's communications with Carpenter (Exhibit B).   The government may also seek to admit portions of the defendant's post-arrest statement.

hearsay." *United States v. Mahaffy*, No. 05-CR-613 (ILG), 2007 WL 1094153, at *2 (E.D.N.Y. Apr. 10, 2007) (internal quotations omitted); *see also United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) (holding that "while the Government was free to introduce the statement as an admission by a party-opponent, [the defendant] had no right to introduce it on his own" (citations omitted)). Were the law otherwise, a defendant "could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005). Indeed, a defendant may not offer his own prior hearsay statements in an "attempt to get [his] side of the . . . story in front of the jury without him[self] testifying and opening him[self] up to cross-examination." *United States v. Davidson*, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004).

Nor, except in extremely limited circumstances, may a defendant introduce his own out-of-court statements as evidence of his state of mind. The state of mind exception to the hearsay rule allows into evidence "[a] statement of the declarant's then-existing state of mind . . . but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3). The declarant's state of mind must be relevant, and the statement cannot be offered for any underlying truth. *See United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993) (proposed state-of-mind evidence inadmissible under Rule 803(3) because it was offered not to prove co-defendant's state of mind, but to prove defendant's past conduct). "The exclusion of statements of memory or belief proffered to prove the fact remembered or believed is necessary to prevent the exception from swallowing the hearsay rule. This would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind." *United States v. Cardascia*, 951 F.2d 474, 487 (2d Cir.

1991) (alterations adopted; internal quotations omitted).   To be admissible, the statement must be forward-looking and not backward-looking.   *See id.* (citing *Shephard v. United States*, 290 U.S. 96, 104 (1933), for proposition that statement, "Dr. Shephard has poisoned me," is not admissible as an existing state of mind because it was backward-looking).

The defendant's own prior hearsay statements are also not admissible pursuant to the rule of completeness.   Under Federal Rule of Evidence 106, courts only permit inclusion of otherwise hearsay testimony where it is "essential to explain an already admitted document, to place the admitted document in context, or to avoid misleading the trier of fact."   *United States v. Gotti*, 457 F. Supp. 2d 395, 397-98 (S.D.N.Y. 2006).   Self-serving exculpatory statements are not admissible by a defendant unless "their exclusion would unfairly distort the meaning of the declarant's non-hearsay statements that are in evidence."   *United States v. Harper*, No. 05-CR-6068L, 2009 WL 140125, at *5 (W.D.N.Y. Jan. 20, 2009).   Accordingly, the Second Circuit has excluded hearsay statements offered by the defendant that, by their omission, do not distort the admitted statements.   *See United States v. Gonzalez*, 399 F. App'x 641, 645 (2d Cir. 2010) (affirming district court's decision to exclude portion of defendant's statement where admitted portion did not distort the meaning of the full statement); *United States v. Johnson*, 507 F.3d 793, 796 (2d. Cir. 2007) (affirming district court's decision to exclude portions of confession that did not explain the admitted portion or place the admitted portion in context, noting that while "[t]he admitted portion of the confession related to . . . plans to execute the robbery, . . . the redacted portion related to the execution of the robbery" (emphasis omitted)); *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999) (rejecting claim under the completeness doctrine that later portions of conversation provided relevant context and noting that "the portions of the tape proffered by [defendant] consisted largely of [his] own self-serving statements, which, as offered by him, are

inadmissible hearsay").   The completeness doctrine does not "require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages."   *Johnson*, 507 F.3d at 796 (citations omitted).[9]

The law is clear: while the government may introduce the defendant's prior statements as admissions of a party-opponent, the defendant may not introduce his own prior statements via the testimony of other witnesses or via cross-examination.   Therefore, the Court should preclude the defendant from cross-examining government witnesses about the defendant's prior statements that the government does not seek to admit.

## VI.    The Court Should Preclude Evidence or Argument Improperly Impugning the Government's Investigatory and Prosecutorial Conduct

The defendant should be precluded from introducing evidence or making arguments before the jury that seek to impugn or otherwise put at issue the government's conduct or motives in its prosecution of this matter.   The defendant has already raised such allegations repeatedly, including during court proceedings and in his several unsuccessful motions to dismiss the Indictment.   For example, the defendant has repeatedly argued, and the Court has repeatedly declined to find, that the government: (i) improperly withheld *Brady* material; (ii) made misrepresentations about that material; (iii) caused the spoliation of evidence; (iv) caused delays that violated the defendant's right to a speedy trial; and (v) committed "outrageous misconduct" by running a "secret mass entrapment operation."   *See* ECF Nos. 190-1, 235-1 (Memoranda and Orders).   The defendant has also repeatedly advanced a narrative that he is a victim, targeted by

---

[9]    Although this case law predates changes to Federal Rule of Evidence 106, the new Rule 106 simply codifies the existing rule that hearsay rules do not bar the introduction of a portion of the defendant's statement that actually "in fairness ought to be considered" to permit the jury to evaluate the admitted portion—for example, because it contextualizes or otherwise explains the admitted portion.   *See* Advisory Committee Notes—2023 Amendment.

the government because of his purported mental infirmities. *See* ECF Nos. 160 (Motion to Dismiss), 223 (Expert Notice), 245 (Opposition to Government's Motion to Preclude Expert). None of these claims has any bearing on the defendant's guilt or innocence of the charged crimes. Instead, such inflammatory arguments present a substantial risk of misleading and prejudicing the jury or inviting jury nullification and should be precluded.

Courts have consistently held—and often give jury instructions reflecting—that arguments regarding the government's decisions during an investigation and its motives and timing in bringing charges are irrelevant, unduly prejudicial, and improperly invite jury nullification. *See, e.g.*, *United States v. Saldarriaga*, 204 F.3d 50, 52 (2d Cir. 2000) (affirming jury charge stating that "[t]he government's function is to give enough evidence to satisfy you beyond a reasonable doubt that the charges are true, and the fact that there are a thousand other things they could have done is wholly irrelevant" (internal quotations and alterations omitted)); *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"); *United States v. Preldakaj*, 456 F. App'x 56, 60 (2d Cir. 2012) (affirming instruction that "[y]ou have heard reference, in the arguments of defense counsel in this case, to the fact that certain investigative techniques were not used by law enforcement authorities[, but t]he government is not on trial, and law enforcement techniques are not your concern"); *United States v. Knox*, 687 F. App'x 51, 54-55 (2d Cir. 2017) (instructing jury that "government is not on trial" was "appropriate" (internal quotations omitted)).

Courts also consistently preclude defendants' attacks on the prosecution's motivation or methods in initiating its prosecution, including arguments that a defendant was improperly targeted. *See, e.g.*, *Farhane*, 634 F.3d at 167 (affirming district court's ruling precluding defendant from arguing in summation that government had improperly targeted him for prosecution); *United States v. Guzman-Loera*, No. 09-CR-466 (BMC), 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018) ("[S]elective-prosecution argument by defendant to the jury would . . . be improper"). The Court should do the same here. *See United States v. Webb, et al.*, No. 15-CR-252 (PKC) (E.D.N.Y), ECF No. 1275, Trial Transcript at 3630:09-3632:12 ("[M]aking argument in the vein of selective prosecution or the government's motive in conducting its investigation; for example, not getting certain evidence or pursuing certain leads and potentially focusing on certain defendants is . . . inappropriate" at trial.); *United States v. Stewart*, No. 03-CR-717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"); *United States v. Reese*, 933 F. Supp. 2d 579, 583-84 (S.D.N.Y. 2013) ("[A] defendant 'may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case.'") (quoting *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004)).

The same applies to claims of prosecutorial misconduct. It has long been held that such allegations must be directed to the court, not the jury. *See United States v. Dupree*, 833 F. Supp. 2d 255, 270 (E.D.N.Y. 2011), *vacated and remanded on other grounds*, 706 F.3d 131 (2d Cir. 2013) ("It is established Second Circuit law that allegations of prosecutorial misconduct are properly directed to the judge, not the jury."); *see also United States v. Young*, 283 F. App'x 858, 860 (2d Cir. 2008) (defendant's argument regarding alleged misconduct by the government was

more appropriately directed to the court rather than to a jury); *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997) ("[W]e agree with the district court's decision to resolve for itself whether the government's conduct was lawful and to prevent Regan from presenting evidence [that the grand jury investigation was illegitimate]."); *see also United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991) ("A motion to dismiss an indictment alleging outrageous governmental conduct is a question of law directed to the trial judge.").

Here, the defendant has already made a number of allegations of government misconduct to the Court, and the Court has ruled on those allegations.   Such pretrial issues already decided by the Court are not proper argument at trial.   *See Dupree*, 833 F. Supp. 2d at 272 ("The court cannot and will not permit this case to become a referendum before the jury on the appropriateness or legality of government conduct that has already been found appropriate and lawful and which has no bearing on the reliability of evidence offered against defendants. Therefore, the court grants the government's motion to preclude defendants from presenting evidence or eliciting testimony during direct or cross-examination regarding their allegations of prosecutorial misconduct."), *rev'd and remanded on other grounds*, 706 F.3d 131 (2d Cir. 2013); *United States v. Lights*, No. 15-CR-721, 2016 WL 7098633, at *1-2 (S.D.N.Y. Dec. 5, 2016) ("This issue has been litigated and decided.   No reference to the illegality of the stop or subsequent searches will be permitted at trial . . ."); *see also United States v. Ragano*, 24-CR-50 (HG) (E.D.N.Y.), ECF No. 58, Pretrial Conference Tr. at 45:5-13 (THE COURT:   "[T]here doesn't seem to be a dispute that July 5th was a coordinated investigative technique to send in John Doe to elicit, if possible, incriminating statements from your client.   I expect the government to do that in an investigation.   And you can -- if your argument is that somehow that's improper, that I won't allow because there's nothing improper about that."); *United States v. Hilliard*, 19-CR-358 (PKC)

33

(E.D.N.Y.), Trial Tr. at 1270 (THE COURT: "Sustained.   Ladies and gentlemen, it's not for you to decide if the prosecution is just. . . .   Again, the Government is not on trial[,] ladies and gentlemen.").

Nor does the defendant's purported entrapment defense allow him to present these otherwise inadmissible arguments.   The fact that the defendant may be permitted to argue that the government induced his conduct does not mean that he is permitted to argue that the government engaged in misconduct during the investigation or prosecution of the case.   The former is an argument properly placed before the jury; the latter is a matter for the Court (and one that has been definitively decided here multiple times).   *See, e.g.*, *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) ("There are significant differences between a claim of entrapment and a claim of outrageous governmental conduct.   A successful entrapment defense requires that a defendant convince the fact-finder that government agents induced her to commit an offense that she was not otherwise predisposed to commit.   []   However . . . [a defendant may also challenge] an indictment based upon a showing of governmental conduct that is *found by the court* to be outrageous.") (emphasis added).

VII.    <u>If the Court Precludes Expert Testimony on the Defendant's Mental Health, it Should Also Preclude Other Evidence or Argument About the Same</u>

On April 3, 2025, the defendant provided notice that he intends to "introduce expert testimony at trial relating to a mental disease or defect or any other mental condition bearing on the issue of guilt" pursuant to Federal Rule of Criminal Procedure 12.2(b).   *See* ECF No. 223.   In particular, the defendant intends to offer the testimony of Dr. Mary Cohen, whom he portrays as an expert on ██████████████████████, regarding her diagnosis of the defendant with ██.   *See id.*   The government thereafter moved to preclude such testimony on the grounds that

34

it is irrelevant to the charges, unhelpful to the jury, and otherwise inadmissible.  *See* ECF No. 236. The Court has not yet ruled on the government's motion.

If the Court precludes expert testimony about the defendant's ███, as it should for the reasons articulated in the government's motion, *see* ECF No. 236, it should similarly preclude any other evidence of, reference to, or argument about the same.   Moreover, whether or not the Court precludes expert testimony about the defendant's ███, it should preclude any evidence or argument as to other conditions previously referenced by him but not diagnosed by Dr. Cohen, including ████████████████████████████████, as well as any argument about the defendant's youth at the time of the alleged conduct.   Such information is irrelevant and inadmissible for the same reasons already stated in the government's expert motion, *see id.*, and for the additional reasons discussed below.

If the Court agrees, as the government has argued, that such information is not relevant to the defendant's entrapment defense, then there is no other proper purpose to present it to the jury.   Details about the defendant's personal background and characteristics have no bearing on, and are not probative of, whether the defendant committed the charged crime.   This sort of emotional appeal to the jury's sympathy should be excluded under Rule 403.   When evidence is of limited probative value, it should be excluded if it has the "potential to engender sympathy in an inappropriate effort to excuse defendant's commission of the charged offences." *United States v. Miller*, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009); *see also United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that the defendant had son with cerebral palsy); *United States v. Battaglia*, No. S9 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *United*

*States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in [a] sympathetic light").

Similarly, evidence that is not relevant and merely promotes jury nullification is inadmissible. *See, e.g.*, *In re United States*, 945 F.3d 616, 626 (2d Cir. 2019) (reaffirming that "it is not the proper role of courts to encourage nullification"); *United States v. St. Rose*, No. 11-CR-349 (SJ), 2012 WL 1107659, at *1 (E.D.N.Y. Apr. 2, 2012) ("As the Defendant is not an American citizen, a conviction in this case may have consequences with respect to her immigration status. The Defendant is also the mother of a dependent child.   However, these factors do not bear on the Defendant's innocence or guilt.   Accordingly, the Defendant shall not argue that she should be acquitted out of sympathy for her, her family, or her immigration status."); *Reese*, 933 F. Supp. 2d at 583 ("[T]he Court will not permit Reese to advance arguments aimed at jury nullification."); s*ee also United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) ("Because the jury enjoys no right to nullify criminal laws, and the defendant enjoys a right to neither a nullification instruction nor a nullification argument to the jury, the potential for nullification is no basis for admitting otherwise irrelevant evidence.").

The Court's power to exclude arguments that encourage jury nullification—arguments that the jury should render a verdict not in accordance with the law—arises from Rules 401, 402 and 403 of the Federal Rules of Evidence.   Specifically, evidence is admissible only if it is both relevant—having "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence," Fed. R. Evid. 401(a)—and not otherwise inadmissible, Fed. R. Evid. 402.   Even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury[.]"

Fed R. Evid. 403.   Under these rules, evidence that merely promotes jury nullification is inadmissible.   *See, e.g.*, *St. Rose*, 2012 WL 1107659, at *1; *Reese*, 933 F. Supp.at 583.

For these reasons, the defendant should not be permitted to invite juror sympathy and nullification based upon his youth or any asserted mental health conditions, which do not bear on the elements of the charged offense.   Nor should he be permitted, setting aside his purported entrapment defense, to invite the jury to excuse his conduct because his youth or mental health conditions ostensibly made him easily indoctrinated by other ISIS sympathizers online.   Such an argument would call for jury nullification and is expressly prohibited.   *See United States v. Agnello*, 158 F. Supp. 2d 285, 288 (E.D.N.Y. 2001) ("The fatal flaw in the defendant's proffer is that the evidence is aimed, not at negating intent, but rather at suggesting that the defendant was unable to control his actions, an issue which Congress has expressly excluded as a defense."); *United States v. Griffin,* 1996 WL 140073 (S.D.N.Y. 1996) (rejecting defense that defendant was "easily controlled and readily influenced" by others).

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court grant the government's motions *in limine*.

Dated:      Brooklyn, New York
             May 15, 2025

                                   JOSEPH NOCELLA, JR.
                                   United States Attorney
                                   Eastern District of New York

By:       /s/
                                     Ellen H. Sise
                                   Lindsey R. Oken
                                   Andrew D. Reich
                                   Assistant U.S. Attorneys
                                   (718) 254-7000