

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NJM:EHS/LRO/ADR      *271 Cadman Plaza East*
F.#2019R01179      *Brooklyn, New York 11201*

September 15, 2025

<u>Via ECF</u>

The Honorable Carol Bagley Amon
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

         Re:     <u>United States v. Awais Chudhary</u>
                   <u>Docket No. 20-CR-135 (CBA)</u>

Dear Judge Amon:

       The government respectfully submits this letter regarding the sentencing of the defendant Awais Chudhary scheduled for September 23, 2025. On or about June 9, 2025, the defendant pleaded guilty, pursuant to a plea agreement, to attempting to provide material support to the Islamic State of Iraq and al-Sham ("ISIS"), a designated foreign terrorist organization, in violation of 18 U.S.C. § 2239B. Specifically, in August 2019, the defendant planned to commit a knife attack in Queens on behalf of ISIS. The recommended sentence for the defendant under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), as well as the statutory maximum sentence for the offense of conviction, is 240 months' imprisonment. Pursuant to the terms of the plea agreement, the government respectfully requests that the Court sentence the defendant to 144 months' imprisonment and lifetime supervision, which the government submits is a sufficient but not greater than necessary to achieve the goals of sentencing.

      I.     <u>Background</u>

       The following information is taken from the defendant's Presentence Investigation Report ("PSR") and other evidence gathered as part of the investigation and prosecution of the defendant. For at least 16 months, the defendant collected violent ISIS propaganda including gruesome beheadings. He shared violent ISIS propaganda with other ISIS supporters online, including via an instructional video he created called, "How to get the files," which instructed users how to access hundreds of violent ISIS propaganda files and urged users to take precautions such using as a virtual private network (which would obscure their location) when accessing the files and highlighted that there were other videos on the top to "bury the actual content," *i.e.*, the violent ISIS propaganda.

In addition to consuming ISIS propaganda, the defendant persistently supported ISIS and its terrorist goals. First, in September 2018, 11 months before the defendant was arrested, by his own admission, he repeatedly contacted now-convicted ISIS supporter Benjamin Carpenter. After successfully contacting Carpenter, for the six months leading up to his arrest, the defendant expressed his support for ISIS, and in fact assisted ISIS in its propaganda efforts by helping ISIS target English-speaking recruits on the internet. Second, as charged in this case, the defendant sought to advance ISIS's ends by planning, himself, to perpetrate a violent attack on behalf of ISIS. The defendant planned to commit a violent knife attack in Queens. In his conversations with an undercover agent, the defendant—without prompting—asked for help to "build a bucket bomb." The defendant confirmed that he had *already* sworn formal allegiance to ISIS. And when asked for pictures of where he might commit an attack, the defendant told the undercover agent that he had made a video of the target location, a bridge in Queens, one hour *before* he was ever asked about it. Consistent with his support of ISIS, the defendant had already put substantial thought into the logistics of a terrorist attack, and took independent, real-world steps toward committing an attack, including scouting a target location, evaluating whether and where he could conduct a bomb attack, and ultimately seeking out and purchasing a suitable knife as part of his final plan of action.

A. <u>The Defendant's Radicalization Through Consumption of ISIS Propaganda</u>

Long before the defendant ever interacted with any undercover agent, he possessed and consumed vast quantities of ISIS propaganda, including materials and videos that depicted knife attacks and other graphic violence. As the government learned through searching some of the defendant's electronic devices following his arrest, the defendant possessed all 13 issues of *Rumiyah*, ISIS's online propaganda magazine, that were ever published. Metadata associated with the 13 *Rumiyah* issues indicate that these documents were on the defendant's computer in April 2018, 16 months before the defendant's arrest. The second issue of *Rumiyah* includes an article titled "Just Terror Tactics" describing how to commit a so-called lone wolf knife attack,[1] including advice on what type of knife to choose. The issue includes a picture of a bloody knife on its cover, as well as a picture of a knife with the caption "choosing the right weapon," both depicted below. The article advises, among other things, that attackers acquire a knife with a "guard," which it describes as a "a protruding piece of metal … to prevent one's hand from sliding forward onto the blade when plunging it into a victim."



---

[1] A "lone wolf" attack refers to a terrorist attack committed by a single individual, often inspired by a terrorist organization, rather than an attack planned by external operatives of a group.

The fourth issue of *Rumiyah* described how to commit a knife attack, including the ideal knife to use, and places to strike. The defendant sent an image from this article to an undercover agent more than a year after the article was downloaded to the defendant's computer. The image below on the left is from the *Rumiyah* article on the defendant's computer; the image on the right is an image that the defendant sent to a UC.



Dozens of videos of ISIS propaganda were also found on the defendant's laptop computer, showing his consumption of violent ISIS content. Those videos included:

- A video showing ISIS fighters taking knives, lining up hostages, and beheading them, titled "Islamic State – Even Though The Infidels Dislike It." In the context of pretrial litigation, the Court viewed a version of this video, which was edited to end before the actual beheadings. The Court noted, "That's one of the most chilling videos I've ever seen." (Aug. 18, 2022 Tr. at 39:21-22.) Notably, metadata indicates that the defendant had this video on his computer since July 2018.

- A video encouraging people to commit terrorist attacks wherever they are, including in America. It depicts a map with a knife over it, ostensibly depicting where a knife attack occurred. The video depicts violence, including individuals firing machine guns and explosions.

- A video showing a van exploding, narrated by Abu Bakr al-Baghdadi, the then-leader of ISIS.

- A video depicting the ISIS flag and narrated by al-Baghdadi. The video is translated into English with subtitles that begin, "This is a message that we address to America."

- A video depicting the ISIS flag in the upper left-hand corner and two vehicles exploding.

- A video produced by al-Hayat Media, the media wing of ISIS showing the ISIS flag and the beginning of a speech by Abu Yayha al-Libi, a high-ranking al Qaeda official. The video goes on to depict ISIS training, including fighting with a knife.

- A video of Osama bin Laden and the ISIS flag.

The defendant also possessed a written copy of Sheikh Abu Muhammad Adnani's infamous "Die In Your Rage" speech, in which al-Adnani urged followers, including Americans, to conduct attacks wherever they were, including through use of knives. Metadata from the defendant's computer reflects that he possessed a written copy of the speech since July 6, 2018, and last accessed it on August 16, 2019, less than two weeks before his arrest.

The defendant also possessed a Samsung phone that contained dozens of audio recordings of Anwar al-Awlaki, an al Qaeda leader who is widely regarded as the leading figure inciting English-speaking Muslims to participate in violent jihad (even in 2019, which was approximately eight years after Awlaki's death). The Samsung phone also stored dozens of images of ISIS propaganda, including several depicting ISIS flags and ISIS fighters, some of whom are holding machine guns and others whom are holding knives. The defendant also had an Apple iPhone, which included a note about martyrdom, *i.e.*, dying for religious beliefs, from early July 2019.

  B. <u>The Defendant's Collaboration with Convicted Terrorist Benjamin Carpenter</u>

In addition to collecting and consuming ISIS propaganda, the defendant edited and propagated it. Evidence obtained through a judicially authorized search of the defendant's HTC cellphone (the "HTC Device") establishes that the defendant helped Benjamin Carpenter edit ISIS propaganda. Carpenter—who went by the handle "Abu Hamza"—was later convicted of attempting to provide material support to ISIS and sentenced to 20 years' imprisonment for his role in translating ISIS propaganda. *See United States v. Carpenter*, No. 21 Cr. 38 (KAC) (E.D. Tenn.); *see generally id.* ECF No. 224 (summarizing Carpenter's role as a translator for ISIS's Al Hayat Media Center). The defendant began communicating with Carpenter in September 2018, and the defendant's communications with Carpenter on the HTC Device date back to at least as early as February 2019. A declaration submitted by the defendant in support of a prior motion to dismiss, *see* ECF No. 177, indicates that:

> A user named Abu Hamza had posted something online. He
> seemed very knowledgeable about Islam. . . I had to get his

> attention and get his help. I asked him a question [.] . . . I sent him more questions I had about Islam and interpretations of different texts and he responded[.] . . . Abu Hamza finally responded and invited me to chat on Telegram. He also invited me to a group chat. On or about the last week of September 2018, Abu Hamza introduced me on Telegram to two users I now know to be undercovers and said they were "two pious, knowledgeable brothers that can help you with your questions akhi" or something similar.

As the complete factual record in this case reflects, the defendant was mistaken that, in 2018, Carpenter—or "Abu Hamza"—introduced the defendant to "undercovers." *See* Court's July 23, 2024 Classified Mem. & Order. Nevertheless, the defendant's declaration reflects several key admissions: he proactively, on multiple occasions, reached out to Carpenter, who was later convicted of working on behalf of ISIS; and he was first brought into a Telegram group chat by Carpenter.

As reflected in communications recovered from the defendant's HTC Device, between February 2019 until August 27, 2019—two days before the defendant's arrest—the defendant and Carpenter exchanged hundreds of messages. The messages reflect that the defendant conspired with Carpenter to provide material support to ISIS by translating ISIS propaganda material. Specifically, Carpenter was convicted at trial for attempting to provide material support to ISIS for publishing a large body of ISIS media, including his weekly newsletter entitled *From Dabiq to Rome* ("*DTR*"), a periodical that, among other pro-ISIS propaganda themes, celebrated the deaths of American soldiers, glorified suicide bombers, and called for open war against the United States and its Western allies. *Carpenter*, No. 21 Cr. 38 (KAC) (E.D. Tenn.), ECF No. 224, at 8, 12-13.[2] Telegram messages between Carpenter and the defendant show that the defendant proofread, and edited ISIS propaganda propagated by Carpenter, including *DTR*.

The below is an illustrative example of Carpenter requesting that the defendant edit *DTR*, and the defendant agreeing and providing edits. On or about March 9, 2019, the following exchange occurred in one-on-one messages between the defendant and Carpenter.

> Carpenter: are you available now to proof read [sic] the newsletter?
>
> need you to read it and check for grammatical errors and spelling mistakes
>
> Chudhary: Alhamdulullahir Rabbil 'Alamin[3] yes
>
> Carpenter: ok stay there

---

[2] The time period in the *Carpenter* indictment post-dates the defendant's arrest.

[3] This translates roughly to "All praise is due to God, Lord of all the worlds."

>   sending
>
>   [sends File Name: From Dabiq To Rome #53.pdf]
>
> Chudhary: How should I inform if there are mistakes?
>
> Carpenter: Should take you about 20 minutes maybe
>
>   Screenshot
>
>   Okay inshaAllah
>
> ***
>
> Carpenter: everything ok?
>
> Chudhary: Yes, alhamdulillah still checking and placing screenshots in word doc inshaAllah
>
> ***
>
> Carpenter: Will release soon in sha Allah
>
> Chudhary: I would not do that if I were you here are the fixtures alhamdulillah, please forgive me as it is difficult at times with thr [sic] screenshots, please pull that release down and here are the fixtures
>
> [sends File name: 53 Fixtures.docx]

A document recovered from the defendant's laptop, titled in the same name, "53 Fixtures.docx," ostensibly reflects edits the defendant made to Issue 53 of *DTR*. *See* Exhibit B. The metadata associated with "53 Fixtures.docx" indicates that the defendant is the author, and that it was created on March 9, 2019, edited for 1 hour 37 minutes, and last saved by the defendant. The document comprised edits to *DTR* articles, including one that glorified ISIS terrorists who had killed 30 people in an attack in Afghanistan. This was only one example of the more than at least half dozen times the defendant provided edits to Carpenter's ISIS propaganda.

    C.    <u>The Defendant's Plan to Commit a Terrorist Attack on Behalf of ISIS</u>

After marinating in violent ISIS propaganda, and propagating the same, the defendant planned his own violent attack—including analyzing when his attack location was the most crowded so he could inflict the most terror—and took concrete steps to carry it out. Between approximately August 23, 2019, and his arrest on August 29, 2019, the defendant repeatedly expressed his support for ISIS and his desire to conduct a terrorist attack in the Eastern District of New York. On or about August 23, the defendant communicated with two law enforcement officers acting in an undercover capacity ("UC-1" and "UC-2"), who were operating one account and posing as a supporter of ISIS through a text messaging application, Telegram.

Specifically, the defendant requested information from UC-1, preferably a video, regarding "the proper knife" for committing a stabbing attack, as well as information regarding "how to not leave traces of finger prints [sic], DNA, etc." The defendant said that he needed that

information because he was "in the west." The defendant also said that he was asking Allah to "not let us get caught or imprisoned, for indeed the entire plot belongs to Allah alone."

During that same conversation, the defendant said that he was going to commit a knife attack "because that's what [he] know[s]" how to do but that if UC-1 could instruct him "on how to build a bucket bomb," the defendant would consider a bombing attack. Later in the conversation, the defendant stated that he needed to know the best way to make a bomb "swift with no traces left behind." He further explained that, as possible targets for an attack, he was considering a "quiet and darker area that's near a wide river where people pass," or a "mini bridge over a busy road with many cars." The defendant stated that the latter location was why he had "mentioned the bucket bomb" in order "to target multiple vehicles." When asked what kind of attack he wanted to conduct, the defendant responded that he intended to commit the attack as a lone wolf. The defendant also stated during the conversation with UC-1 that he had given "ba'yah" to Ameer al-Mu'mineen." "Bay'ah" refers to a pledge of allegiance and "Ameer al-Mu'mineen" refers to the then-leader of ISIS, Abu Bakr al Baghdadi. The defendant explained that he did not have a proper knife for the attack and wanted to know the name of the type of knife required. He also wrote that he had viewed an image online of "the ideal knife," which depicted a hand guard on the knife.

UC-1 thereafter requested that the defendant send photographs of the locations that he was considering for an attack. The defendant replied that he had taken videos of the locations an hour earlier, *i.e.*, prior to UC-1 making the request, and that he was sending a video to UC-1. The defendant stated that the video depicted the bridge he had mentioned earlier and that he "was thinking about simply throwing bucket bomb or several light weight bombs at the car over the fencing but the problem is I do not know how to make them." The defendant further stated that he was sending another video to UC-1 depicting the "knife area," noting that the video files were large because he had recorded them with his cellphone. Ostensibly because of the size of the files recorded by the defendant, UC-1 directed the defendant to send the videos to another account which UC-2 controlled.

The defendant thereafter sent videos of the attack locations to UC-2: (1) a video depicting a bridge, (2) a video titled "First Portion after bridge," and (3) a video entitled "Third Portion after bridge." The defendant explained that the videos depicted the location he was considering for a knife attack. He further stated that he was considering targeting "the vehicles by throwing the bucket bomb or light weight explosives over the fencing at the vehicles." The videos of the proposed attack locations included videos of the pedestrian bridges over the Grand Central Parkway to the Flushing Bay Promenade (the "Promenade") in Queens, New York. The videos of the proposed attack locations that the defendant sent to UC-2 were found on the defendant's laptop.

Also on August 23, the defendant sent UC-2 a screenshot of a document with the words "Islamic Stat[e]" at the top and the subheadings "Places to Strike," "The Ideal Knife," and "Knives to Avoid." The instructions further included a diagram of the human body depicting where to stab victims with a knife. As described above, that image is from an issue of *Rumiyah*, an online ISIS propaganda magazine. The same issue of *Rumiyah* was found on the defendant's

8

laptop. The defendant also sent UC-2 two screenshots of a video depicting a bomb attack. After sending the first video screenshot, the defendant wrote, in an apparent reference to the bomber depicted in the video, "This is what I mean by bucket bomb or something hefty as you see he placed it and then moved away for its hefty explosion with the grace of Allah." After sending the second screenshot the defendant wrote, "And this is what I mean by a light weight easy to carry explosive." The video of an explosion that these screenshots were taken from, was found on the defendant's laptop. The defendant then asked UC-1 to download the videos of the attack locations and asked UC-1 to "please watch them" in order to view "the terrain/land/structure." The bombing video screenshots that the defendant sent to UC-2 appeared to be produced by ISIS, featuring a graphic of an ISIS flag in the upper left-hand corner.

The next day, the defendant and UC-1 communicated through Telegram. the defendant stated that he had selected the attack locations because they seemed to have "easier escape routes" and "more room for [his] scooter." The defendant then sent a photograph of a scooter. Later in the conversation, UC-1 noted that the defendant could die in an attack if he was not able to escape and asked the defendant whether he was "ok" with dying. The defendant replied that he was and stated, "May Allah not turn our hearts away or make us ever doubt or hesitate."

Thereafter, the defendant explained his timeline for procuring supplies to conduct an attack. He said that he wanted to start with acquiring a knife, "because buying materials for explosives . . . bring suspicion by the crusaders and their miserable worshipers." The defendant further explained that he had searched Amazon for the knife he wanted to use in the attack but could not find the "proper knife." He then asked UC-1 to suggest the name of the knife he would need and asked whether he would also need gloves and a mask. After UC-1 sent the defendant a photograph of a knife, the defendant responded noting that "buying a knife like this draws attention." The defendant also stated that he wanted to record his attack to inspire others to do the same: "And I was wondering how will I record this? Which camera to buy to put on chest or forehead [sic]? I want footage for this insha'Allah because we incite all believers to perform Jihad."

Later in the conversation, the defendant provided further details regarding his attack plans. He explained that he was considering an attack at 4:00 p.m. in the afternoon because "this is when it's most crowded" in the targeted areas he intended to attack. The defendant also sought guidance from UC-1 regarding the use of "medical latex gloves" during the attack, and whether wearing such gloves would "not leave fingerprints and DNA." The defendant requested videos from UC-1, including "training videos on how to effectively use knife and training in general . . . as training for Jihad for Allah is worshiping in itself," and informed UC-1 that he believed there were surveillance cameras located in the vicinity of "the gas station and donut shop and restaurant" near one of the attack locations he was considering, offering to make additional video recordings of the area for UC-1 to view.

D. The Defendant's Reconnaissance in Preparation for an Attack

FBI agents conducted surveillance of the defendant's East Elmhurst residence (hereinafter the "Residence"). The surveilling agents saw the defendant leave the Residence and

walk to the area near the Promenade. During their surveillance of the defendant, the surveilling agents video recorded the defendant's activities around the Promenade.

The surveillance video depicted the defendant entering the Promenade in the vicinity of 27th Avenue and Ditmars Boulevard. As he walked in and around the Promenade, the defendant stopped to take videos and photographs of the area with a cellphone. At times, the defendant appeared to take videos and photographs in a surreptitious manner, holding the cellphone close to his chest. The video also depicted the defendant taking videos and/or photographs of, among other things, parts of the Promenade; the World's Fair marina located in or around the Promenade; a security gate leading to the marina; a gas station and a donut shop located in or around the Promenade; and a security camera located in the vicinity of the donut shop. After the defendant recorded those videos, law enforcement officers surveilled him returning to his Residence.

The defendant sent 16 additional surveillance videos that he had recorded to UC-1. All 16 videos were recovered from the defendant's laptop. In addition, the defendant sent UC-1 three portions of the same map of the Promenade and World's Fair Marina. These three images were also found on the defendant's laptop.

    E.    <u>The Defendant Purchased a Knife and Tactical Equipment in Preparation for an Attack</u>

Over the ensuing days, the defendant messaged further with UC-1 about his planning a stabbing or bombing attack on behalf of ISIS in the United States and his preparations for that attack. The defendant made clear that the attack would be imminent.

The defendant again asked UC-1 for a video demonstrating the use of a knife in an attack so he could "use it effectively," and stated that he had never "shot a real gun nor used a knife to spill the impure blood of a kafir."[4] the defendant further explained that if he learned how to use a knife "properly," then he could "move and strike swiftly, all for the sake of Allah."

Later in the conversation, the defendant explained that he planned to change his clothes after the attack but that he might face challenges based on his plan, professing concern that his family would recognize him by any of his clothes. The defendant then asked UC-1 what clothes to buy, including whether he should buy "tactical kaki [sic] colored pants."

The defendant added that he considered committing the attack "near one of the Masjids and then enter the Masjid for changing clothes," where there was "a lot of darkness" and he could "wait therein if their police forces or army -- woe to them -- come, as they do after an attack by the Khilafah," and to leave his backpack and scooter to retrieve them later.[5]

---

    4    "Kafir" refers to "non-believers," or non-Muslims.
    5    "Masjid" refers to a mosque and "Khilafah" refers to the leader of the "caliphate," or Islamic State.

The defendant discussed with UC-1 what items to order from Amazon, also touching on the use of a "locker" to receive items that the defendant wanted to order from Amazon for the attack. UC-1 thereafter created an account for the defendant on Amazon (the "Amazon Account") and preloaded it with cash. The defendant and UC-1 then discussed the purchase of different items for the attack, including, among others, several knives, a strap for the defendant's cellphone, gloves, a mask, and clothing that the defendant suggested should "blend in and not [be] too eye catching." After UC-1 informed the defendant that he had put the items, including three knives, in the Amazon Account's shopping cart, the defendant then sent UC-1 screenshots of two knives and informed UC-1 that he was "having difficulty choosing between" them. UC-1 placed the following items in the shopping cart: (a) an 11-inch black "Fixed Blade Tactical Knife"; (b) a nine inch high carbon "Fixed Blade Knife"; (c) a two-piece "Tactical Combat Survival Hunting & Neck Knives"; (d) a cellphone chest and head strap; (e) a polo shirt; (f) tactical lightweight assault cargo pants; (g) a black face mask; and (h) a pair of "Covert Tactical" gloves."

The defendant thereafter discussed with UC-1 when he should have the items delivered and sent UC-1 a screenshot indicating that he had selected the shipment date for August 28. UC-1 then asked the defendant how soon he intended to commit the attack, to which the defendant responded, "Very soon," and that he would do it "possibly on a Jumu'ah."[6]

Later that day, the defendant sent UC-1 a screenshot indicating that he had ordered a "420 High Carbon Stainless Steel Fixed Blade Survival Tactical Knife," along with a purchase confirmation addressed to the Amazon Account indicating that the order would be delivered to an Amazon retail location located in Queens, New York, during the first week of September 2019.

On August 25 and 26, 2019, the defendant discussed with UC-1 the additional items he wished to purchase. The defendant stated that he would cancel the order for the knife because he wanted to have it delivered more quickly—possibly in anticipation of an imminent terrorist attack. He then sent UC-1 a screenshot that appeared to be a page from Amazon, containing the defendant's original knife order, with the phrase "Attempting to Cancel" at the top. The defendant subsequently informed UC-1 that he had found "one with a serrated edge," and sent UC-1 a screenshot of a knife with a serrated edge. The defendant explained to UC-1 that the items would be delivered on August 28, 2019, and that he would use Amazon's "free locker delivery."

The defendant then told UC-1 that he ordered the items and sent UC-1 a screenshot that appeared to be from Amazon, depicting, among other things, khaki-colored pants, a mask, a strap, and gloves. In fact, on August 26, 2019, the Amazon Account ordered the following items to be delivered to an Amazon locker located in Queens, New York: (a) a 420 High Carbon Stainless Steel Fixed Blade Survival Tactical Knife; (b) a cellphone chest and head strap; (c) tactical lightweight assault cargo pants; (d) a black face mask; and (e) a pair of "Hard Knuckle Full Finger Tactical Gloves" (collectively the "Attack Items").

On or about August 29, 2019, law enforcement officers conducted surveillance and observed the defendant depart the Residence and travel to the Amazon retail location located in

---

[6] "Jumu'ah" refers to Islam's Friday prayer.

11

Queens, to which he had ordered the Attack Items. Law enforcement officers thereafter saw the defendant approach the Amazon locker while in possession of two cellphones. Officers arrested the defendant as he attempted to open the locker. Law enforcement agents then used the code associated with the locker to open the locker. Inside the opened locker was the Amazon package containing the Attack Items.

II. The Defendant's Plea Allocution

On August 26, 2022, the defendant pleaded guilty before the Honorable Robert M. Levy, United States Magistrate Judge, to the sole count of the Indictment. Following the Court's denial of repeated motions to dismiss, on March 21, 2025, the Court granted the defendant's motion to withdraw his guilty plea. On June 9, 2025, pursuant to a plea agreement, the defendant again pleaded guilty to attempting to provide material support to a foreign terrorist organization and the Court accepted the guilty plea.

III. ███████████████████████



7



IV. <u>Applicable Law</u>

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." *Id.* at 50 (citation and footnote omitted). "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." *United States v. Sindima*, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original). "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." *United States v. Aldeen*, 792 F.3d 247, 251-252 (2d Cir. 2015), *as amended* (July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding to arrive at the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

V.  The Advisory Guidelines Sentence

In the PSR, the United States Probation Department ("Probation") calculated the defendant's advisory Guidelines sentencing range as follows:

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2M5.3) | 26 |
| Plus:  Specific Offense Characteristic (use of knife) | +2 |
| Plus:  Terrorism Enhancement (§ 3A1.4(a)) | +12[8] |
| Acceptance of Responsibility (§ 3E1.1(a)) | -2 |
| **Total Offense Level** | **38** |

---

[8] To the extent that the defendant argues that, in calculating the applicable Guidelines range, the Court should ignore the terrorism enhancement (*see* Def. Mot. at 31-35), such an approach would be clear error. There is no factual basis to support not applying the terrorism enhancement. Indeed, the defendant stipulated that the terrorism enhancement applies. While the Court may consider the parties' plea agreement, the Court's analysis should begin with a correct Guidelines calculation—which yields 20 years—and a correct understanding that it could sentence the defendant to between zero and 20 years' incarceration. The government contends—for the reasons set forth herein—that a 12-year incarceratory term is appropriate under 18 U.S.C. § 3553(a).

(PSR ¶¶ 44-53). Probation likewise correctly determined that the defendant's criminal history category is VI because the offense involved, or was intended to promote, a federal crime of terrorism. *See* U.S.S.G. § 3A1.4(b). Thus, the defendant's advisory Guidelines range is 360 months to life imprisonment. (PSR ¶ 106). Because the count of conviction has a statutory maximum sentence of 20 years, the defendant's effective Guidelines range is 240 months' imprisonment. *Id.*

VI. <u>A Sentence of 144 Months' Imprisonment and Lifetime Supervision Accurately Reflects the Seriousness of the Offense Conduct</u>

The sentence imposed on the defendant must reflect the seriousness of the conduct, deter the defendant specifically from committing further crimes, deter others from attempting to provide material support to ISIS and conducting attacks on behalf of or at the direction of ISIS, and promote respect for the law. These factors all counsel in favor of a significant term of imprisonment.

As the facts described above indicate, the criminal conduct at issue is exceptionally serious. After witnessing a post from a professed ISIS support advocating violence, the defendant's initial response was, "Please give me information, preferably video showing the proper knife with its name (because I can't find the name of it after seeing it), and more information . . . such as how to not leave traces of finger prints [sic] , DNA, etc. as I'm in the west." Before being asked by UC-1 to do so, the defendant conducted surveillance, identifying exactly where in Queens he planned to commit his attack—targeting high pedestrian-traffic areas such as the Promenade and the World's Fair Marina. He took measures to evade law enforcement. In addition to seeking advice on how not to leave behind forensic evidence, he considered committing the attack "near one of the Masjids and then enter the Masjid for changing clothes," where there was "a lot of darkness" and he could "wait therein if their police forces or army -- woe to them -- come, as they do after an attack by the Khilafah," and to leave his backpack and scooter to retrieve them later. He purchased a knife and other tactical gear. Finally, the defendant sent the undercover ISIS propaganda, including a diagram of the human body depicting where to stab victims with a knife.[9] Thankfully, the defendant was arrested before he was able to inflict the violence he intended to commit, and to add to the litany of murderous activities committed and inspired by ISIS. Had law enforcement not timely intervened, however, the defendant's plan could have easily resulted in multiple deaths—and, as the defendant intended, widespread terror in the community and beyond.

The sentence in this case should also be sufficiently serious to deter the defendant from committing future crimes, as well as deter others contemplating similar criminal conduct. A significant sentence will help ensure that the defendant is sufficiently deterred from attempting to provide material support to ISIS anytime in the future. Although the defendant now claims to

---

[9] As the Court is aware, the diagram was only a fraction of the violent ISIS propaganda found on the defendant's electronic devices. Other propaganda included a video encouraging people to commit terrorist attacks wherever they are, including in America. This propaganda included a map with a knife over it, ostensibly depicting where a knife attack occurred.

15

disavow ISIS, his plea allocution and the arguments made in his sentencing letter demonstrate that he has not taken full responsibility for his actions, which suggests that absent a 144-month sentence and lifetime supervision, the defendant may well begin to support ISIS again. The defendant's sentencing submission entirely elides the seriousness of the offense, and the defendant fails to fully accept responsibility for his near-deadly actions. Failing to acknowledge the gravity of his misconduct, and persistence in blaming others, is troubling and suggests a serious risk that he will reoffend, rather than any kind of a genuine reckoning with what he did and why.

For example, the defendant criticizes the FBI for using an Amazon gift card (Def. Mot. at 11), but the Amazon gift card was used so that the FBI could control the package and not allow the defendant to obtain a knife. Likewise, the defendant faults the FBI for trying to pivot the defendant to a "bucket bomb." *Id.* at 11-12. First, "bucket bomb" was *the defendant's* terminology in his initial communications with UC-1 (*see supra*), and second, the FBI was concerned that the defendant could get a knife anywhere and so wanted a plan that would make the defendant less dangerous to the safety of others. But more than just wrongly trying to share the blame for his misconduct, the defendant's minimization bespeaks an unwillingness to confront that part of himself that was, for more than a year long period, devoted to a violent terrorist organization in its efforts to destroy this nation.

A significant sentence is also necessary to show any other person interested in committing lone-wolf terrorist attacks that they will receive appropriately severe consequences. ISIS relies on actors like the defendant to commit attacks in the United States. This sentence should send a message to those would-be actors.

Finally, the defendant's requested term of eight years' imprisonment would create unwarranted sentencing disparities between the defendant and other similarly-situated defendants. For example, in *United States v. Saleh*, No. 15 Cr .517 (WFK), the defendant was sentenced to 360 months' imprisonment for attempting to provide material support to ISIS after making several attempts to travel overseas and join ISIS. In *United States v. Redzepagic*, No. 17 Cr. 228 (DRH), the defendant, who also made several unsuccessful attempts to travel and join ISIS, pled guilty to providing material support to ISIS and al-Nusrah Front, and received a 200-month term of imprisonment. Carpenter, the ISIS media figure with whom the defendant conspired with as described above, was sentenced to 244 months' imprisonment.

On the other hand, the cases cited by the defendant are not factually analogous cases and the Court sentencing the defendant to a significant term of imprisonment will not create unwarranted sentencing disparities with those cases. *See* Def. Mot. at 36-40. The majority of the cases cited by the defendant are not material support cases. *See United States v. Ashiqul Alam*, No. 19 Cr. 280 (LDH) (E.D.N.Y) (guilty plea to possession of a firearm with an obliterated serial number); *United States v. Abu-Rayyan*, No. 16 Cr. 20098 (E.D. Mich.) (guilty plea to making a false statement to acquire a firearm and possession of a firearm by a prohibited person); *United States v. Sebastian Gregerson*, No. 16 Cr. 20552 (E.D. Mich.) (guilty plea to possession of unregistered destructive devices); *United States v. Conor Climo*, No. 19 Cr. 232 (D. Nev.) (guilty plea to possession of bomb making components); *United States v. Fabjan Alameti*, No. 19 Cr. 13 (D. Mont.) (guilty plea to making false statements in a terrorism investigation); *United States v.*

*Jonathan Xie*, No. 20 Cr. 781 (D.N.J.) (guilty plea to concealing material support under 18 U.S.C. § 2239C); *United States v. Jihad Ali*, No. 21 Cr. 20109 (S.D. Fl.) (guilty plea to conspiracy). The remaining cases cited by the defendant do not involve defendants who planned violent attacks like the defendant. *See United States v. Michael Solomon et al.*, No. 20 Cr. 193 (D. Minn.) (36- and 48-month sentences where defendants plotted to make silencers for Hamas); *United States v. Kim Vo*, No. 19 Cr. 223 (NRB) (S.D.N.Y.) (12-month sentence for 18 U.S.C. § 2339A violation where defendant sent threating videos to non-profit organization); *United States v. Samantha El Hassani*, No. 19 Cr. 159 (N.D. In.) (78-month sentence for terrorism financing); *United States v. Delowar Hossain*, No. 19 Cr. 606 (SHS) (96-month sentence for defendant who attempted to travel to Afghanistan). Accordingly, the Court should not consider these sentences in fashioning a just sentence for the defendant.

VII. ███████████████████████



10



In any event, the seriousness of the stakes in a case like this—the likelihood that this defendant would commit numerous acts of murder in order to change a global conversation and advance the interests of the violent terrorist organization to whom he felt allegiance—merits a substantial term of incarceration. It also mandates that the Court, together with the government, take whatever measures are available to ensure that the defendant does not progress as far in his attack-planning the next time. Accordingly, ensuring that the defendant is subject to a lifetime term of supervised release, as is frequently appropriate in terrorism cases, will ensure that the Court retains some level of insight into the defendant's behavior, and may provide a tripwire to ensure that the necessary parties are alerted the next time this defendant seeks to add to ISIS's body count.

VIII. <u>Conclusion</u>

Accordingly, for the forgoing reasons, the government respectfully requests that the Court find that a sentence of 144 months' imprisonment and lifetime supervision is appropriate given the seriousness of the conduct.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/                   
Ellen H. Sise
Lindsey R. Oken
Andrew D. Reich
Assistant U.S. Attorneys
(718) 254-7000

Kevin C. Nunnally
Trial Attorney
National Security Division
(202) 598-9700

cc: Clerk of Court (by ECF)